197 A.2d 741

RHONDA BOSLAND, ON BEHALF OF HERSELF AND ALL OTH-
ERS SIMILARLY SITUATED, PLAINTIFF–RESPONDENT, v.
WARNOCK DODGE, INC., D/B/A WARNOCK DODGE/CHRYS-
LER/JEEP, DEFENDANT–APPELLANT, AND JOHN DOES 1–10
AND ABC CORPORATIONS 1–10, DEFENDANTS.

Argued October 6, 2008—Decided February 19, 2009.

*Eric L. Chase* argued the cause for appellant (*Bressler, Amery & Ross,* attorneys; *Mr. Chase, Ronald J. Campione and Stephen R. Knox,* on the briefs).

*Andrew R. Wolf* argued the cause for respondent (*Galex Wolf and Glen H. Chulsky,* attorneys; *Mr. Wolf, Mr. Chulsky and Lora B. Glick,* on the letter briefs).

*Marvin J. Brauth* submitted a brief on behalf of amicus curiae New Jersey Coalition of Automotive Retailers, Inc. (*Wilentz, Goldman & Spitzer,* attorneys; *Mr. Brauth and Jeffrey J. Brookner,* on the brief).

*Bruce D. Greenberg* submitted a brief on behalf of amicus curiae Consumers League of New Jersey (*Lite DePalma Greenberg & Rivas,* attorneys).

*Michael R. McDonald* submitted a brief on behalf of amicus curiae New Jersey Lawsuit Reform Alliance (*Hughes, Hubbard & Reed,* attorneys; *Mr. McDonald and Diane E. Lifton,* of counsel and on the brief).

Justice HOENS delivered the opinion of the Court.

The Consumer Fraud Act (CFA), *N.J.S.A.* 56:8–1 to –20, affords broad protections to New Jersey consumers. From 1960, when the Legislature first enacted the CFA in its original form and when it only authorized actions by the Attorney General, *see L.* 1960, *c.* 39, until its most recent amendment in 2007, *L.* 2007, *c.* 14, (amending *N.J.S.A.* 56:8–1.1 as it relates to transportation for temporary service workers), the history of the Act demonstrates a strong and consistent pattern of expanding the rights of consumers and protecting them from a wide variety of marketplace tactics and practices deemed to be unconscionable.

This matter calls upon this Court to consider whether a plaintiff, prior to instituting litigation pursuant to the CFA, must first request a refund of a claimed overcharge from an allegedly culpable merchant. Our reading of the plain language of the statute and our understanding of the Legislature's overall intent, both in enacting the CFA and in expanding its scope, compels us to answer this question in the negative. We therefore conclude that the CFA does not require a consumer, who has been victimized by a practice which the statute is designed to remedy, to seek

a refund from the offending merchant as a prerequisite to filing a complaint.

Although there may be sound reasons for adopting a different approach entirely or for limiting the available remedies to ameliorate the harsh consequences of the CFA in circumstances in which a consumer does not first offer the merchant the opportunity to make amends in advance of pursuing litigation, we conclude that those concerns implicate public policy choices that are for the Legislature, rather than this Court, to make.

I.

The facts that give rise to this dispute are not complicated. On March 13, 2003, plaintiff Rhonda Bosland purchased a new 2003 Jeep Grand Cherokee from defendant Warnock Dodge, Inc. She did not arrange for financing through the dealer, instead paying the full purchase price listed in the Retail Buyer's Order that served as defendant's invoice. That Retail Buyer's Order included a $117 charge that was described only as a "Registration Fee."

Plaintiff asserts that she later learned that the applicable title and registration fees charged by the Motor Vehicle Commission at the time of her purchase were less than the $117 fee the dealer required her to pay. Although there were two ways to calculate what that $117 sum might have represented, plaintiff discovered that the applicable fee could only have been either $77 (comprised of a $74 registration fee and a $3 temporary registration fee) or $97 (representing the sum if an additional $20 title fee could properly be included as a "registration fee"). She therefore reasoned that, regardless of how the $117 charge had been calculated, it must have included an additional documentary service fee that was neither disclosed nor itemized as required by the applicable automobile sales regulations. *See N.J.A.C.* 13:45A–26B.1, --26B.2(a)(2)(i).

Rather than demanding that defendant refund to her the amount that she had been overcharged, plaintiff filed a complaint, seeking relief both individually and on behalf of a class of similarly

situated car buyers. Plaintiff's complaint included three separate causes of action. Two were statutory claims, one asserting that defendant had violated the CFA, and the other relying on the provisions of the Truth–in–Consumer Contract, Warranty, and Notice Act (TCCWNA), *N.J.S.A.* 56:12–14 to –18. The third cause of action was based upon an alternative quasi-contractual theory of unjust enrichment. Defendant promptly moved to dismiss the complaint for failure to state a claim on which relief may be granted, *see R.* 4:6–2(e). After considering the arguments, the motion court denied the motion to dismiss and directed plaintiff to file an amended complaint that more specifically explained the basis for each of the claims asserted.

After plaintiff filed her amended complaint, defendant again moved to challenge the sufficiency of the complaint. The motion court, after briefing and argument, issued an order and letter opinion dated September 25, 2006, in which the court granted defendant relief and dismissed the complaint. In explaining its basis for dismissing the CFA claim, the court reasoned:

> Plaintiff never complained about these overages, so it seems counterintuitive to consider these fees unconscionable and an ascertainable loss. Instead, these fees were Defendant[']s profit or fees for processing or handling these papers which Plaintiff, as a consumer, paid without objection.

In analyzing the TCCWNA claim, the court found that plaintiff could not meet the requirements of that statutory cause of action, because her factual allegations were insufficient to establish that the contract violated any "clearly established legal right," *N.J.S.A.* 56:12–15. Finally, the trial court rejected plaintiff's unjust enrichment claim, reasoning that there was no evidence that defendant had obtained any benefit "separate and distinct from the written contract," as a result of which plaintiff could not prevail on that quasi-contractual claim.

The Appellate Division, in a published opinion, affirmed in part and reversed in part. *Bosland v. Warnock Dodge, Inc.,* 396 *N.J.Super.* 267, 933 *A.*2d 942 (App.Div.2007). Although concurring in the trial court's rejection of plaintiff's unjust enrichment claim, the appellate panel disagreed with the trial court's dismissal

of the two statutory causes of action. *Id.* at 269–70, 933 *A.*2d 942. In particular, the panel concluded that the allegations provided a sufficient factual basis for plaintiff's claim that the $20 or $40 overcharge constituted an undisclosed documentary service fee, *id.* at 274, 933 *A.*2d 942, and rejected the trial court's conclusion that plaintiff's CFA claim was barred by her failure to demand a refund prior to filing her lawsuit, *id.* at 277–78, 933 *A.*2d 942. As part of the analysis about whether a pre-suit demand for a refund is required by the CFA, the appellate panel explicitly rejected the reasoning of *Feinberg v. Red Bank Volvo, Inc.*, 331 *N.J.Super.* 506, 752 *A.*2d 720 (App.Div.2000), an earlier Appellate Division decision in which the court had referred to such a demand as "a necessary element of proof." *Id.* at 511–12, 752 *A.*2d 720.

Having concluded that plaintiff's CFA claim should not have been dismissed, the Appellate Division also reinstated her TCCWNA claim, concluding that the complaint's CFA allegations also sufficed to support her claim that the contract violated a clearly established legal right. *Bosland, supra,* 396 *N.J.Super.* at 278, 933 *A.*2d 942.

We granted defendant's petition for certification in order to decide whether an attempt to obtain a refund from a merchant is an essential prerequisite for a CFA claim. 194 *N.J.* 262, 944 *A.*2d 25 (2008). We thereafter granted leave to the New Jersey Coalition of Automotive Retailers, Inc. (NJCAR), the New Jersey Lawsuit Reform Alliance (NJLRA), and the Consumers League of New Jersey (CLNJ) to submit briefs as amici curiae.

## II.

Defendant asks us to reverse the Appellate Division's conclusion that a pre-suit demand for a refund is not a prerequisite to a CFA complaint, relying on three arguments. First, defendant urges us to conclude that the Appellate Division erred by departing from the rationale expressed by the court in *Feinberg* and in failing to appreciate that, even though an attempt to secure a refund is not explicitly required under the CFA, there can be no ascertainable

loss in the absence of having made that effort. Second, defendant argues that we should reject plaintiff's claimed cause of action on the ground that the alleged $20 overpayment, when compared to the value of the vehicle plaintiff has used and enjoyed without any complaint, is not the type of loss that the CFA was intended to remedy. Finally, defendant contends that the Appellate Division's decision will lead to an inequitable result, contrary to the purposes and goals of the CFA because instead of promoting truth and fair dealing in the marketplace, and instead of providing a remedy for those who have no option but to resort to the court system, it will encourage consumers to litigate, in the hope of obtaining awards of treble damages and attorneys' fees, rather than simply asking for a refund that would make them whole.

Plaintiff responds by arguing that there are only three elements necessary to establish a cause of action for relief pursuant to the CFA, none of which is a requirement that a claimant first ask for a refund. Plaintiff asserts that the Appellate Division correctly recognized that the contrary language in *Feinberg* was dicta and that the *Feinberg* decision itself did not extend to CFA claims generally, but was intentionally limited to fact patterns similar to the one that the court there confronted. *See Feinberg, supra,* 331 *N.J.Super.* at 511, 752 *A.*2d 720 ("We consider ... [pre-suit demand of a refund] a necessary element of proof in a matter such as this."). Finally, plaintiff argues that imposing on consumers a pre-litigation requirement that they seek direct relief from an offending merchant would subvert the CFA's purposes, because merchants would be free to violate the CFA, providing refunds only to those consumers savvy enough to request them while reaping unfair profits from unconscionable practices committed against all other consumers without fear of reprisal.

Amicus NJCAR argues that the Appellate Division's analysis would permit the CFA to be used to punish merchants for accidental violations or honest mistakes as opposed to affirmative misconduct, thus expanding the remedies of the statute beyond the scope intended by the Legislature. NJCAR urges this Court

to conclude that the remedial purposes of the CFA are most properly effectuated when a consumer is required to make a demand for a refund first because the consumer can then be made whole without the need for court intervention.

Amicus NJLRA argues that the Appellate Division erred by failing to recognize that the requirement that a consumer first seek a refund is implicit in both the ascertainable loss and causal nexus elements of the CFA cause of action. Moreover, NJLRA cautions that permitting consumers to initiate CFA actions without first demanding a remedy from the merchant will overwhelm our courts with litigation that could and should have been amicably resolved.

Amicus CLNJ disagrees with the positions espoused by the other amici, arguing that the Appellate Division's judgment should be affirmed and that this Court should make clear that the CFA does not require a consumer to demand a refund prior to initiating suit. It points out that the Legislature chose not to include such a requirement and that, in light of the broad remedial purposes of the CFA, the courts should not read any additional requirements into the statute. At the same time, CLNJ urges us to confine the *Feinberg* decision to its unique factual circumstances, arguing that public policy considerations militate against imposing such a requirement generally. In short, CLNJ asserts that requiring a pre-suit refund demand will confuse consumers and lawyers, limit the ability of consumers to pursue class actions, and undermine the CFA's goal of deterring violations, because it will create a means for dishonest merchants to avoid CFA lawsuits by providing refunds only to consumers who know that they should request one.

## III.

This matter calls upon us to decide whether the CFA includes, either explicitly or implicitly, a requirement that a consumer first demand a refund of an overcharged sum from a merchant prior to

instituting litigation. In engaging in the task of discerning a statute's meaning, our role is clear and well-defined.

### A.

Our task in statutory interpretation is to determine and effectuate the Legislature's intent. *See D'Annunzio v. Prudential Ins. Co. of Am.,* 192 *N.J.* 110, 119, 927 *A.*2d 113 (2007); *Daidone v. Buterick Bulkheading,* 191 *N.J.* 557, 565, 924 *A.*2d 1193 (2007). As we have explained, in carrying out this important role, "we look first to the plain language of the statute, seeking further guidance only to the extent that the Legislature's intent cannot be derived from the words that it has chosen." *Pizzullo v. N.J. Mfrs. Ins. Co.,* 196 *N.J.* 251, 264, 952 *A.*2d 1077 (2008). We will, in this effort, read the words selected by the Legislature in accordance with their ordinary meaning, *D'Annunzio, supra,* 192 *N.J.* at 119–20, 927 *A.*2d 113, unless the Legislature has used technical terms, or terms of art, which are construed "in accordance with those meanings," *In re Lead Paint Litig.,* 191 *N.J.* 405, 430, 924 *A.*2d 484 (2007). *See N.J.S.A.* 1:1–1 (declaring that "words ... having a special or accepted meaning in the law, shall be construed in accordance with such ... meaning."). Nor will we "rewrite a plainly-written enactment of the Legislature ... [or] presume that the Legislature intended something other than that expressed by way of the plain language." *O'Connell v. State,* 171 *N.J.* 484, 488, 795 *A.*2d 857 (2002).

If, however, the plain language of a statute is not clear or if it is susceptible to more than one possible meaning or interpretation, the Court looks to extrinsic secondary sources to serve as its guide. We have traditionally looked to a variety of such sources to aid us in our interpretation, including, for example, legislative history, *see Daidone, supra,* 191 *N.J.* at 565–66, 924 *A.*2d 1193, statements of the sponsor or sponsors of bills that were enacted, *see Panzino v. Cont'l Can Co.,* 71 *N.J.* 298, 301–03, 364 *A.*2d 1043 (1976), and, where relevant, a Governor's press release, *see Cox v. Sears, Roebuck & Co.,* 138 *N.J.* 2, 15, 647 *A.*2d 454 (1994), or his or

her conditional veto message, *see Roberts v. State, Div. of State Police,* 191 *N.J.* 516, 521–22, 924 *A.*2d 550 (2007).

Regardless of whether the language is plain or whether ambiguities cause us to seek guidance from sources other than the words the Legislature has chosen, our "primary task . . . is to effectuate the legislative intent in light of the language used and the objects sought to be achieved." *State v. Hoffman,* 149 *N.J.* 564, 578, 695 *A.*2d 236 (1997) (quoting *Merin v. Maglaki,* 126 *N.J.* 430, 435, 599 *A.*2d 1256 (1992) (internal quotation marks omitted)). This task is often assisted by interpreting a statute consistently with the overall statutory scheme in which it is found. *See Merin, supra,* 126 *N.J.* at 436, 599 *A.*2d 1256.

### B.

The CFA, in its original form, authorized only the Attorney General to seek redress for violations of its provisions. As we have explained, "[t]he Legislature enacted the CFA in 1960 to address rampant consumer complaints about fraudulent practices in the marketplace and to deter such conduct by merchants." *Thiedemann v. Mercedes–Benz USA, L.L.C.,* 183 *N.J.* 234, 245, 872 *A.*2d 783 (2005) (citing *Furst v. Einstein Moomjy, Inc.,* 182 *N.J.* 1, 11, 860 *A.*2d 435 (2004)); *see Cox, supra,* 138 *N.J.* at 21, 647 *A.*2d 454 (citing Senate Committee, *Statement to the Senate Bill No. 199* (1960)).

In 1971, the Legislature amended the CFA, expanding it significantly to include a private right of action through the enactment of *L.* 1971, *c.* 247, § 7, the provision subsequently codified at *N.J.S.A.* 56:8–19. That section, which is central to the dispute before this Court, provides as follows:

> Any person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act or the act hereby amended and supplemented may bring an action or assert a counterclaim therefor in any court of competent jurisdiction. In any action under this section the court shall, in addition to any other appropriate legal or equitable relief, award threefold the damages sustained by any person in interest. In all actions under this section, including

those brought by the Attorney General, the court shall also award reasonable attorneys' fees, filing fees and reasonable costs of suit.
[*N.J.S.A.* 56:8–19.]

Although the legislative history surrounding this enactment is sparse, it is clear that the intention was to greatly expand protections for New Jersey consumers. The sponsor of the amendments, then-Assemblyman Thomas H. Kean, was quoted at the time as saying that "the amendments represent an enlightened approach to provide greater protection for the consumer against fraud." *Governor's Press Release for Assembly Bill No. 2402*, at 1 (Apr. 19, 1971) (issued in support of the introduction of the bill containing amendments). Echoing that sentiment, Governor William Cahill described these amendments to the CFA as being intended to "give New Jersey one of the strongest consumer protection laws in the nation." *Ibid.* Upon signing the bill into law, the Governor further explained that he believed that the amendments would "provide easier access to the courts for the consumer, [would] increase the attractiveness of consumer actions to attorneys and [would] also help reduce the burdens on the Division of Consumer Affairs." *Governor's Press Release*, at 2 (June 29, 1971).

There are distinctions between the CFA requirements that govern claims pursued by the Attorney General and those permitted to be brought by private parties. In particular, a private party seeking to recover must demonstrate that he or she has suffered an "ascertainable loss." *Meshinsky v. Nichols Yacht Sales, Inc.*, 110 *N.J.* 464, 472–73, 541 *A.*2d 1063 (1988). In addition, the CFA requires a consumer to prove that the loss is attributable to the conduct that the CFA seeks to punish by including a limitation expressed as a causal link. *See id.* at 473, 541 *A.*2d 1063; *Daaleman v. Elizabethtown Gas Co.*, 77 *N.J.* 267, 271, 390 *A.*2d 566 (1978). In considering these requirements, we have been careful to interpret the CFA, and its prima facie proof requirements, so as to be faithful to the Act's broad remedial purposes. *Weinberg v. Sprint Corp.*, 173 *N.J.* 233, 251, 801 *A.*2d 281 (2002) (interpreting CFA so as to effectuate the legislative

intent of limiting private causes of action to claims based on assertions of ascertainable loss); *see Thiedemann, supra,* 183 *N.J.* at 247, 872 *A.*2d 783 ("[T]he prima facie proofs necessary for a private cause of action under the CFA must be applied compatibly with the CFA's remedial nature."). In particular, we have recognized that "[t]he history of the [CFA] is one of constant expansion of consumer protection." *Gennari v. Weichert Co. Realtors,* 148 *N.J.* 582, 604, 691 *A.*2d 350 (1997). Similarly, our Appellate Division has noted that we "construe the [CFA] broadly, not in a crabbed fashion." *New Mea Constr. Corp. v. Harper,* 203 *N.J.Super.* 486, 502, 497 *A.*2d 534 (App.Div.1985).

 We have traditionally recognized that CFA claims brought by consumers as private plaintiffs can be divided, for analytical purposes, into three categories. *See Cox, supra,* 138 *N.J.* at 17, 647 *A.*2d 454. Broadly defined, the categories are claims involving affirmative acts, claims asserting knowing omissions, and claims based on regulatory violations. *Ibid.* To some extent, the proofs required will vary depending upon the category into which any particular claim falls. For example, we have concluded that if a claimed CFA violation is the result of a defendant's affirmative act, "intent is not an essential element." *Id.* at 17–18, 647 *A.*2d 454. Likewise, intent is not an element if the claim is based on a defendant's alleged violation of a regulation, because "the regulations impose strict liability for such violations." *Id.* at 18, 647 *A.*2d 454; *see Fenwick v. Kay Am. Jeep, Inc.,* 72 *N.J.* 372, 378, 371 *A.*2d 13 (1977). In contrast, we have required that a plaintiff seeking to recover based on a defendant's omission, "must show that the defendant acted with knowledge, and intent *is* an essential element of the fraud." *Cox, supra,* 138 *N.J.* at 18, 647 *A.*2d 454 (emphasis in original). Viewed against this framework, we can evaluate the dispute before us.

## C.

 We turn then to the nature of the proofs required of plaintiff and their relationship to the need to demand a refund

prior to filing suit. Plaintiff's CFA claim is straightforward; it is premised on her assertion that the single, unified charge in the invoice for a "registration fee" exceeded the amount, however calculated, that was permitted to be charged for such a fee and therefore included an undisclosed "documentary service fee" in violation of the applicable regulations. *See N.J.A.C.* 13:45A–26B.1, –26B.2(a)(2)(i). Because plaintiff's complaint is based on a claimed regulatory violation, she is not required to prove defendant's intent. *See Cox, supra,* 138 *N.J.* at 18, 647 *A.*2d 454.

In analyzing claims under the CFA, we have found that there are only three elements required for the prima facie proofs: 1) unlawful conduct by defendant; 2) an ascertainable loss by plaintiff; and 3) a causal relationship between the unlawful conduct and the ascertainable loss. *Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co., Inc.,* 192 *N.J.* 372, 389, 929 *A.*2d 1076 (2007) (explaining three prima facie elements); *see Weinberg, supra,* 173 *N.J.* at 247–48, 801 *A.*2d 281 (declining to abolish ascertainable loss requirement for private cause of action); *Meshinsky, supra,* 110 *N.J.* at 473, 541 *A.*2d 1063 (recognizing that private plaintiff, unlike Attorney General, must demonstrate "ascertainable loss [ ... ] as a result of" unlawful conduct); *Daaleman, supra,* 77 *N.J.* at 271, 390 *A.*2d 566 (explaining that private plaintiff must show that he or she "suffers a loss due to" defendant's unlawful practice). Each of the elements of the prima facie case is found within the plain language of the statute itself; each is, without any question, a prerequisite to suit.

The plain language of the CFA does not, however, impose upon any putative plaintiff the requirement that he or she first seek a remedy directly from the offending merchant. Instead, it refers to the right of "any person who suffers any ascertainable loss ... as a result of" defendant's violation of the CFA to file an action. *N.J.S.A.* 56:8–19. On its face, then, the statute makes no demand upon plaintiff to try to obtain a refund first as a pre-condition of instituting suit. The question, however, is whether the term "ascertainable loss" or the causal nexus requirement embodied in

the statutory phrase "as a result of" or the public policy considerations that underlie the CFA suggest that a pre-suit refund demand is implicit in the CFA.

We have previously considered the meaning of the term "ascertainable loss," and have concluded that it means that plaintiff must suffer a definite, certain and measurable loss, rather than one that is merely theoretical. *Thiedemann, supra,* 183 *N.J.* at 248, 872 *A.*2d 783. We found it appropriate to resort to the definition of the words, noting that " '[a]scertain' is defined as 'to make (a thing) certain; establish as a certainty; determine with certainty;' and 'ascertainable,' the adjective, is similarly defined as 'capable of being ascertained.' " *Ibid.* (quoting *Webster's Third New International Dictionary* 126 (1981)). "The certainty implicit in the concept of an 'ascertainable' loss is that it is quantifiable or measurable." *Ibid.*

Apart from relying on the definition of the term, we have further considered a variety of issues that relate to the meaning of the "ascertainable loss" requirement. We have held that a consumer who had repairs to a vehicle performed under warranty at no cost did not sustain such a loss. *Id.* at 251–52, 872 *A.*2d 783. Nor does it exist for a customer who considered, but never purchased, a product and thus suffered no damages because of a fraudulent loan application submitted by the merchant in anticipation of a sale. *Meshinsky, supra,* 110 *N.J.* at 475 n. 4, 541 *A.*2d 1063. On the other hand, we have described our understanding of the ascertainable loss requirement generally in terms that make it equivalent to any lost "benefit of [the] bargain." *Furst, supra,* 182 *N.J.* at 11–13, 860 *A.*2d 435 (quantifying lost benefit of the bargain by reference to out-of-pocket expenses for purposes of ascertainable loss analysis).

Even so, we have not always equated an ascertainable loss with one that is demonstrated by an immediate, out-of-pocket expense suffered by the consumer. *See Thiedemann, supra,* 183 *N.J.* at 248, 872 *A.*2d 783. For example, we have found that a consumer who had not paid for repairs nonetheless suffered an

ascertainable loss caused by a home improvement contractor's failure to comply with applicable regulations requiring the work to be inspected. *Cox, supra,* 138 *N.J.* at 22, 647 *A.*2d 454. We analyzed the ascertainable loss requirement by evaluating the consumer's proofs about the reasonable cost of repair in the context of damages that had been awarded by the jury. *Id.* at 22–24, 647 *A.*2d 454. We held that requiring a consumer to actually make the expenditures needed to incur the loss would be contrary to the remedial purposes of the CFA. *Id.* at 22, 647 *A.*2d 454. The CFA does not demand that a plaintiff necessarily point to an actually suffered loss or to an incurred loss, but only to one that is "ascertainable."

Although this appeal, like *Thiedemann,* involves a claim against an automobile dealer, they are not otherwise similar. Unlike a defect in a vehicle that is appropriately remedied by resort to the warranty or through alternate means of relief created by our Legislature, such as the New Jersey Lemon Law, *N.J.S.A.* 56:12–29 to –49, plaintiff was the victim of an overcharge. More to the point, the overcharge in question is one that can be readily quantified and thus is ascertainable within the meaning of the CFA. That she could have requested a refund and, theoretically, could have secured complete relief in no way diminishes the fact that she sustained an immediate, quantifiable loss when she paid the fee representing the overcharge.

Nor are we persuaded that the causal nexus element of the prima facie proofs required for CFA relief implicitly includes the requirement that the victimized purchaser make a pre-suit demand for a refund. Reading the causal nexus requirement as defendant suggests would add to it the notion that a loss that is ascertainable is not caused by the merchant's offending act if it might have been remedied by the consumer through means other than the one that the CFA creates. Such an interpretation of the CFA would be contrary to the plain language that the Legislature chose and to its clear intent. Indeed, we see in defendant's arguments an effort to import into the CFA obstacles that would

impede access to the broad remedial protections for consumers that our Legislature so obviously intended to create.

### D.

Although we do not find in the "ascertainable loss" or causal nexus elements of the CFA cause of action any requirement that consumers first attempt to extinguish a loss by seeking a refund, defendant urges us to embrace the decision of the appellate panel in *Feinberg* on public policy grounds. We decline to do so for two reasons. First, we consider the *Feinberg* decision to be far narrower than defendant suggests. Second, we disagree with defendant's view of the public policy it urges us to embrace, finding it to be contrary to that expressed by the Legislature.

The decision in *Feinberg* arose in rather unique circumstances, revolving around a plaintiff's attempt to recover from a vehicle dealer that failed to explain that its "Sign and Drive" program was subject to a credit check. *Feinberg, supra,* 331 *N.J.Super.* at 509–10, 752 *A.*2d 720. In large part, plaintiff's claim was rejected because the proofs were inadequate to demonstrate what part of the loss, asserted to be bank fees incurred when the plaintiff was rejected based on his fraudulent credit application, were caused by the dealer's allegedly unlawful practice. *Id.* at 511, 752 *A.*2d 720 (citing *Roberts v. Cowgill,* 316 *N.J.Super.* 33, 41, 719 *A.*2d 668 (App.Div.1998)). We agree that a plaintiff who cannot prove the causal link between the asserted regulatory violation and his loss cannot find relief within the CFA. Moreover, we see no unfairness in refusing to find a CFA remedy for a plaintiff whose entire claim was premised on his own decision to engage in a fraudulent transaction. *Ibid.*

We do not, however, agree with the broad reading that defendant would have us give to the language in *Feinberg* that suggested that consumers are first required to demand reimbursement of charges or that such an effort is "a necessary element of proof," *ibid.,* closing the courthouse doors to any who fail to do so. We reach this conclusion not only because our reading of the plain

language of the statute demands it, but because of our view about one aspect of the public policy rationale that undergirds the CFA, but that played no role in the *Feinberg* matter. When confronted, as we are here, with a plaintiff who asserts that she was the victim of an overcharge which itself is small in amount, and who seeks recovery for herself and on behalf of numerous others with "nominal" claims, we cannot overlook the reality that, without the remedy that the CFA affords, all of those wrongs might go unvindicated. *See Local 68, supra,* 192 *N.J.* at 382–85, 929 *A.*2d 1076. As with our view of the rationale that underlies the class action mechanism, *ibid.; see Iliadis v. Wal–Mart Stores, Inc.,* 191 *N.J.* 88, 115, 922 *A.*2d 710 (2007) (explaining significance of availability of class actions in context of nominal damages), we see in the CFA an underlying public policy rationale that gives no support to the suggestion that a pre-suit demand for a refund is required.

There are sound reasons why a pre-suit demand requirement is not implicit in the CFA. This dispute in particular illustrates how reading such a requirement into the CFA would potentially permit practices, that the statute is designed to deter, instead to continue unabated and unpunished. Plainly, if we require plaintiffs, as a precondition to filing a complaint under the CFA, to first demand a refund, we will create a safe harbor for an offending merchant. A merchant could rely on the pre-suit refund demand requirement, boldly imposing inflated charges at no risk, and planning to refund the overcharges only when asked. Such an analysis of the CFA would limit relief by making it available only to those consumers who are alert enough to ask for a refund, while allowing the offending merchant to reap a windfall. We see in the broad remedial purposes of the CFA a strong contrary expression of public policy. We discern in the CFA a clear expression of the Legislature's intent to empower consumers who seek to secure relief for themselves and for others who may not be aware that they have been victimized. Because reading a pre-suit demand for refund requirement into the CFA would thwart those salutary purposes, we will not endorse it.

We recognize that defendant and amici have argued that permitting litigation to proceed without requiring an initial demand for an amicable resolution might lead to unduly harsh consequences for a merchant's honest error. Some of those concerns, however, are unfounded. We do not share their concern, for example, that a small overcharge will result in a treble damage award based on the vehicle's sales price. Even if plaintiff, for example, demonstrates that she was overcharged for the registration fee, it is that overpayment that constitutes her ascertainable loss; she cannot demonstrate that her use of the vehicle was in any way diminished and therefore would not be entitled to CFA recovery based on that vehicle's full value.

In theory, there may be circumstances in which requiring a presuit demand for relief might be appropriate or in which a consumer's failure to seek a refund or other remedy in advance of turning to the courts for relief should operate to limit the recovery otherwise available under the CFA. Nevertheless, because the language and the intent of the statute are clear and its purposes are plain, we consider the concerns raised by defendant and by amici to be matters that call for an examination and a weighing of public policy considerations not within the language of the CFA itself. As such, they are for the Legislature, and not for this Court, to entertain.

## IV.

The judgment of the Appellate Division is affirmed and the matter is remanded to the Law Division for further proceedings.

*For affirmance and remandment*—Chief Justice RABNER and Justices LONG, LaVECCHIA, WALLACE, RIVERA–SOTO and HOENS—6.

*Opposed*—None.