117 A.3d 1267

MARGARET LUCCA, PLAINTIFF, v. WELLS FARGO BANK, N.A. AND SAMANTHA WEINSTEIN, DEFENDANTS.

Superior Court of New Jersey
Law Division
Atlantic County

Decided January 28, 2015.

*Francis J. Ballak* for plaintiff (*Goldenberg, Mackler, Sayegh, Mintz, Pfeffer, Bonchi and Gill,* attorneys).

*John D. North* and *Stephanie Reckord* for defendants (*Greenbaum, Rowe, Smith and Davis, LLP,* attorneys).

WINKELSTEIN, J.A.D. (retired and temporarily assigned on recall).[1]

Between June 21, 2011, and December 21, 2011, then-eighty-two-year-old plaintiff, Margaret Lucca, made approximately twenty-seven wire transfers, in the sum of roughly $330,000, from her account at the Wells Fargo Bank branch in Somers Point, New Jersey. She sent the funds at the direction of an individual who telephoned her home, identified himself as a lawyer, and provided her with the information for the wire transfers. Plaintiff did not know the caller or the beneficiaries of the wire transfers. Put simply, plaintiff was scammed. She never recovered the funds.

Plaintiff filed a four-count complaint against Wells Fargo, and Samantha Weinstein, a Wells Fargo employee. In count one, plaintiff charged defendants with negligence in failing to "discharge [their] duties" to plaintiff; count two claimed breach of contract; count three alleged a violation of the implied covenant of good faith and fair dealing; and count four asserted that defendants "failed to act in good faith" when they failed to "disclose the wire transfers to the appropriate authorities" pursuant to *N.J.S.A.* 17:16T–1 to –4.

The pretrial judge dismissed counts one, two, and three. Those counts are not addressed in this opinion. In declining to dismiss count four, the pretrial judge ruled that the statute, *N.J.S.A.* 17:16T–1 to –4, created an independent cause of action for plaintiff if she could prove that the bank acted in bad faith when it failed to report the suspected scam to the police or to the office of county adult protective services.

At trial before this court in January 2015, the threshold issue was whether *N.J.S.A.* 17:16T–1 to –4 imposes a statutory duty on

---

[1] This opinion is an abridged version of the court's oral decision from the bench following trial.

financial institutions, such as Wells Fargo, to report a suspected scam to the police or the county department of adult protective services, thus creating an independent cause of action for a customer, such as plaintiff, to assert a bad faith claim for the bank's failure to notify the authorities.

Following a two-day bench trial, the court concludes that *N.J.S.A.* 17:16T–1 to –4 does not impose a duty on a financial institution to notify the authorities of a suspected scam. Without such a duty, plaintiff has no independent cause of action to assert a bad faith claim.[2]

Plaintiff was eighty-five years old at the time of trial. She had been living alone since her husband died in February 2003. She had no children and no siblings. She lived in Somers Point, not far from the Wells Fargo bank branch. Her nephew and niece, John Rizzotte and Kathleen Quarry, lived in Hammonton, New Jersey, about a forty-minute drive from Somers Point. Plaintiff was previously employed as a personnel director for Lenox China, but retired more than twenty years ago. She also worked as a receptionist. She stopped working sometime around 1990.

In June 2011, plaintiff received telephone calls from an individual she did not know, who identified himself as a lawyer. He asked her to participate in an enterprise where she could win some money. He told her to go to her bank, and he provided her with the names of beneficiaries for wire transfers, the amount to be transferred, and the bank accounts to which the money should be transferred. The beneficiary of the first wire transfer was an

---

[2] Because the court tried the case under count four of the complaint, and disagrees with the pretrial judge that the statute creates a duty, the court declines to be bound by the law of the case doctrine. That doctrine states that "prior decisions on legal issues should be followed unless there is substantially different evidence at a subsequent trial, new controlling authority, or the prior decision was clearly erroneous." *Toto v. Princeton Twp.*, 404 *N.J.Super.* 604, 617, 962 *A.2d* 1150 (App.Div.2009) (internal quotation marks omitted). Nevertheless, the law of the case doctrine is discretionary, and "should not be used to justify an incorrect substantive result." *Id.* at 618, 962 *A.2d* 1150 (internal quotation marks omitted).

individual in Alabama, and the beneficiary for the remainder of the wire transfers was an individual in Costa Rica. Plaintiff did not know either beneficiary. In fact, she had no relatives or personal contacts in Alabama or Costa Rica.

She did as the man over the telephone instructed her. She went to the bank and signed wire transfer forms, providing the beneficiary and account information he had given to her. At the bank, plaintiff spoke primarily to Samantha Weinstein. Plaintiff also had conversations with Danielle Borcky, a Wells Fargo bank manager.

Plaintiff did not tell anyone at Wells Fargo that she was wiring funds to win money. Between June 21, 2011, and December 21, 2011, plaintiff made approximately twenty-seven wire transfers totaling approximately $330,000 from her Wells Fargo account. Plaintiff testified that no one at the bank told her that she was being scammed. Although she does not recall being told, the court finds that she was in fact told by Weinstein that she was being scammed.

Plaintiff also had an account at the Jersey Shore Federal Credit Union. It was a joint account with Quarry, but it was plaintiff's money. In the summer of 2011, Quarry called Rizzotte after she learned from a credit union employee that plaintiff was trying to wire money from that credit union account. When Quarry questioned plaintiff about the call, plaintiff told her there was "nothing wrong," and that she knew what she was doing. Both Quarry and Rizzotte believed plaintiff was capable of handling her own affairs; both knew that plaintiff did not like people questioning her about her personal finances. In fact, plaintiff subsequently removed Quarry's name from the credit union account because plaintiff wanted sole access to that account.

Virginia Williams, the CEO of Jersey Shore Federal Credit Union, confirmed that plaintiff became angry when she was questioned about the use of her account. Nevertheless, when Williams became aware that plaintiff intended to transfer $27,500 to a bank in Costa Rica, she had plaintiff sign a document at the bank

known as the "Jersey Shore Federal Credit Union Scam/Fraud Awareness" document. She reviewed that document with plaintiff, who signed it on August 10, 2011. Immediately above plaintiff's signature line, the document stated, "This is to certify that I, Margaret J. Lucca, gave instructions to Jersey Shore Federal Credit Union to wire transfer $27,500 to Banco de Costa Rica and that I have read the Fraud Awareness document from Jersey Shore Federal Credit Union." Plaintiff testified that although the document was explained to her, she did not change her mind about making wire transfers.

According to Weinstein, by the third wire transfer she completed for plaintiff, she asked plaintiff if she knew the person to whom she was sending the money. Plaintiff told her to mind her own business. Weinstein testified that plaintiff was always vague about the reasons she was sending the money.

Beginning on July 1, 2011, Weinstein filed a report with the Wells Fargo internal elder abuse department after every wire transfer with which she was involved. Weinstein never heard back from that department. There was no testimony that an internal bank investigation ever occurred.

At the end of December, Weinstein, while reviewing plaintiff's bank records, saw that she withdrew $54,000 from her account at the Wells Fargo branch in Ocean City, which was not the branch where plaintiff normally did her banking. Weinstein called plaintiff, who told her that the money was to be paid "up front for taxes." Weinstein told her that she had been scammed. Weinstein then met with Rizzotte, and eventually a stop-payment was placed on the check. Although the police had been contacted, during the trial there was no testimony from any police officer, law enforcement official, or anyone familiar with what specifically occurred to cause the stop-payment.

Plaintiff testified that she was healthy in 2011, with no serious disabilities, nor did she take medication that would affect her judgment. Plaintiff had been living independently, paying her bills, running her errands, and doing her own shopping. Rizzotte

would speak to her occasionally, and visit with her once a month. Prior to December 28, 2011, he never spoke to her about her personal affairs.

Neither Weinstein nor Borcky testified that plaintiff appeared to have any type of cognitive impairment or was otherwise incapable of handling her own affairs during the six-month period when the wire transfers took place. Aside from the wire transfers themselves, they did not observe anything about plaintiff's demeanor that caused them to suspect that a scam was taking place.

I.

■ Whether Wells Fargo had a duty to report the suspected fraud to the authorities turns upon an interpretation of *N.J.S.A.* 17:16T–1 to –4. In undertaking a review of a statute, a court is guided by the canons governing statutory interpretation. "In interpreting a statute, our role 'is to determine and effectuate the Legislature's intent.'" *Allen v. V and A Bros., Inc.*, 208 *N.J.* 114, 127, 26 *A.*3d 430 (2011) (quoting *Bosland v. Warnock Dodge, Inc.*, 197 *N.J.* 543, 553, 964 *A.*2d 741 (2009)). The court is obligated to glean the Legislature's intent from the words of the statute, giving them their ordinary meaning. *Burnett v. Cnty. of Bergen*, 198 *N.J.* 408, 421, 968 *A.*2d 1151 (2009). This axiom is also expressed in *N.J.S.A.* 1:1–1, which states that a statute's "words and phrases shall be read and construed with their context" and "given their generally accepted meaning. . . ." "To that end, 'statutes must be read in their entirety; each part or section should be construed in connection with every other part or section to provide a harmonious whole.'" *Burnett, supra*, 198 *N.J.* at 421, 968 *A.*2d 1151 (quoting *Bedford v. Riello*, 195 *N.J.* 210, 224, 948 *A.*2d 1272 (2008)).

Put another way, construction is guided by consideration of individual statutory components in the context of the entire enactment. *Waterfront Comm'n of N.Y. Harbor v. Mercedes–Benz of N. Am., Inc.*, 99 *N.J.* 402, 414, 493 *A.*2d 504 (1985). "[A] statute is to be interpreted in an integrated way without undue emphasis on

any particular word or phrase and, if possible, in a manner which harmonizes all of its parts so as to do justice to its overall meaning." *Zimmerman v. Mun. Clerk of Berkeley*, 201 *N.J.Super.* 363, 368, 493 *A.*2d 62 (App.Div.1985).

Further, "courts are not to read into a statute words that were not placed there by the Legislature." *State v. Smith*, 197 *N.J.* 325, 332, 963 *A.*2d 281 (2009). We are precluded from " 're-writ[ing] a plainly-written enactment of the Legislature ... [or] presum[ing] that the Legislature intended something other than that expressed by way of the plain language.' " *Bosland, supra*, 197 *N.J.* at 553, 964 *A.*2d 741 (quoting *O'Connell v. State*, 171 *N.J.* 484, 488, 795 *A.*2d 857 (2002)).

The court is "guided by the legislative objectives sought to be achieved by the statute." *Shelton v. Restaurant.com, Inc.*, 214 *N.J.* 419, 429, 70 *A.*3d 544 (2013). In that vein, "[a] legislative committee's statement of the purpose of a proposed bill, including the nature and effect of the measure, is a highly persuasive indication of legislative intent." *Toogood v. St. Andrews Condo. Ass'n*, 313 *N.J.Super.* 418, 425, 712 *A.*2d 1262 (App.Div.1998).

In sum, as a general rule of statutory construction, the court must first look to the language of the statute. If the statute is clear and unambiguous on its face and imparts only one interpretation, the court "need delve no deeper than the act's literal terms to divine the Legislature's intent." *State v. Butler*, 89 *N.J.* 220, 226, 445 *A.*2d 399 (1982).

> It is not our function as judges to construe statutes in accordance with our privately held views of justice. Instead, we must apply the law as written. [When] the statutory language is crystal clear[,] [t]here is no room for interpretation. We are obliged to enforce the clearly expressed legislative intent.
>
> [*Rutgers Council of AAUP v. Rutgers*, 298 *N.J.Super.* 442, 463, 689 *A.*2d 828 (App.Div.1997) (Baime, J.A.D., concurring).]

Within the contours of these general principles of statutory interpretation, the court turns to the threshold issue—that is, whether *N.J.S.A.* 17:16T–1 to –4 imposes a statutory duty on financial institutions, such as Wells Fargo, to report a suspected scam to the police or the office of county adult protective services,

thus creating an independent cause of action for a customer, such as plaintiff, to assert bad faith for the bank's failure to notify the authorities.

The New Jersey Legislature enacted *N.J.S.A.* 17:16T–1 to –4 in 1998. The statute reads as follows:

*N.J.S.A. 17:16T–1.*

The Legislature finds and declares that many customers of financial institutions have worked diligently to accumulate savings and other resources deposited in, or managed by, financial institutions. Some of these customers are vulnerable to fraudulent or other illegal schemes because of advanced years or because of physical or mental illness, disability or deficiency, or because they lack sufficient understanding of and do not have the capacity to make, communicate or carry out decisions concerning the management of their savings or resources. Financial institutions, in the course of conducting business with these vulnerable customers and senior customers, suspect, from time to time, that these customers are targets of illegal schemes but choose not to act because they are unclear about the conditions under which they may release account information, how much information may be released, and the entities to whom they may release such information. Therefore, the Legislature finds that it is appropriate to provide statutory guidance to financial institutions in this situation.

*N.J.S.A. 17:16T–2.*

. . . .

"Senior customer" means a natural person, who, to the financial institution acting in good faith, appears to be at least sixty years of age. . . .

"Vulnerable customer" means a natural person, who is at least 18 years of age, . . . appears to have a physical or mental illness, disability or deficiency, or lacks a sufficient understanding of, and the capacity to make, communicate or carry out decisions concerning, the management of the customer's savings or resources. . . .

*N.J.S.A. 17:16T–3.*

Notwithstanding any other law, regulation or common law to the contrary, a financial institution may release the financial records regarding a customer's account to a law enforcement agency, a county adult protective services provider, or both if:

a. A vulnerable customer or a senior customer has a beneficial interest in the account either wholly or in part; and

b. The financial institution suspects that illegal activity is, or will be, taking place which involves the account including, but not limited to, defrauding any vulnerable or senior customer who has a beneficial interest in the account.

*N.J.S.A. 17:16T–4.*

a. Any financial institution or officer, employee, or agent thereof, making a disclosure of information pursuant to this act, shall not be liable to the customer under any law or regulation or common law of this State for that disclosure or for any failure to notify the customer of that disclosure.

b. A financial institution or officer, employee, or agent thereof, which decides in good faith not to disclose information which it is permitted to disclose under this act regarding the account or relationship of a senior or vulnerable customer shall not be liable under any law or regulation or common law of this State for that decision.

The Senate Committee Statement explains the purpose of the statute:

The senior citizens and vulnerable adults of this State are sometimes targets of illegal schemes involving their accounts in New Jersey financial institutions. In some of these cases, the financial institutions have knowledge of, or a suspicion of, illegal activity involving these accounts but are reluctant to inform authorities because they may be subject to a civil suit alleging that the customer's common law right of privacy was violated.

This bill provides that financial institutions may release certain customer account information relevant to actual or suspected illegal activities to a law enforcement agency or a county adult protective service provider, or both.

If a financial institution makes the release of information in accordance with the provisions of this bill, it would be immune from liability under any law or regulation or common law of this State in a suit alleging that the customer's right of financial privacy had been violated. In addition, if a financial institution, officer, employee or agent thereof, decides in good faith not to disclose information it is permitted to disclose under this bill, it would not be liable under any law or regulation or common law for that decision. This bill would give financial institutions legal comfort in contacting law enforcement agencies or county adult protective service providers in those cases where they suspect that illegal activity has occurred or may occur involving an account in which a senior or vulnerable customer has a beneficial interest.

The Federal "Right to Financial Privacy Act of 1978," 12 U.S.C. s. 3401 *et. seq.,* provides, among other things, that a financial institution may release account information to federal government agents if the information may be relevant to a possible violation of any statute or regulation. However, the federal law does not address releases of information to state, county or municipal law enforcement agencies or to county adult protective service providers. This bill would comport and parallel the Federal act by providing that financial institutions may release relevant information to State and local law enforcement agencies as well as to county adult protective service providers if a financial institution suspects illegal activity related to a senior or vulnerable customer's account.

[*Senate State Gov't., Banking & Financial Institutions Comm. Statement to S. 888* (June 11, 1988) ("Committee Statement").]

Reading the committee statement in conjunction with the statute, the court concludes that the statute does not require a financial institution to report to the police or adult protective services that the institution suspects a senior or vulnerable customer is the subject of a monetary scam. While the statute encourages disclosure, it does not require disclosure. Rather, the statute gives the institution a safe harbor—it immunizes the institution—if it chooses to release, or not to release, the customer's information.

The court's decision is informed in part by the plain language of the statute and committee statement. *N.J.S.A.* 17:16T–1 says that financial institutions have in the past chosen not to act when they suspect their customers are targets of an illegal scheme because the institutions "are unclear about the conditions under which they may release account information, how much information may be released, and the entities to which they may release such information. Therefore, the Legislature finds that it is appropriate to provide statutory guidance to financial institutions in this situation."

The express purpose of this section is to provide guidance to the bank as to conditions under which it may release information, and to whom and how much information may be released. In no sense does it require a bank to release the information.

*N.J.S.A.* 17:16T–3 speaks in discretionary terms. It says: "[A] financial institution *may* release the financial records regarding a customer's account to a law enforcement agency, a county adult protective services provider, or both." (emphasis added). The term "may" implies a permissive action, not a mandatory action. *MacNeil v. Klein,* 141 *N.J.Super.* 394, 403, 358 *A.*2d 488 (App.Div. 1976) (when Legislature uses the term "may" in a statute, as the word inherently implies, it is generally used in the permissive sense). Furthermore, "the word 'may' should be given the meaning which conforms to the legislative intent." *Id.* at 402, 358 *A.*2d 488.

This brings the court to the language of the Senate committee statement, where the Legislature uses the term "may" rather than "shall." The committee statement says: "This bill provides that financial institutions *may* release certain customer account information relevant to actual or suspected illegal activities to a law enforcement agency or a county adult protective service provider, or both." (emphasis added.) The committee statement further says, in pertinent part, "This bill would give financial institutions legal comfort in contacting law enforcement agencies or County adult protective service providers in those cases where they suspect that illegal activity has occurred or may occur involving an account in which a senior or vulnerable customer has a beneficial interest."

This speaks in terms of permitting the institution to disclose, and giving the institution legal comfort should it choose to do so. It does not suggest a requirement to disclose. And a legislative committee statement of the purpose of a proposed bill, including the nature and effect of the measure, is a highly persuasive indication of legislative intent. *Toogood, supra,* 313 *N.J.Super.* at 425, 712 *A.*2d 1262.

This court's opinion is further informed by the language of the Adult Protective Services Act, *N.J.S.A.* 52:27D–409, which addresses the report of suspected abuse, neglect, and exploitation, as amended in 2009, effective April 17, 2010. When originally enacted in 1993, the original text of *N.J.S.A.* 52:27D–409(a), stated: "A person who has reasonable cause to believe that a vulnerable adult is the subject of abuse, neglect or exploitation may report the information to the county adult protective services provider." As amended, the pertinent section now has two subparts and reads as follows:

(1) A healthcare professional, law enforcement officer, firefighter, paramedic or emergency medical technician who has reasonable cause to believe that a vulnerable adult is the subject of abuse, neglect or exploitation *shall* report the information to the county adult protective services provider.

(2) Any other person who has reasonable cause to believe that a vulnerable adult is the subject of abuse, neglect or exploitation *may* report the information to the county adult protective services provider.

[*N.J.S.A.* 52:27D–409(a) (emphasis added).]

Put simply, while section 409 of the Adult Protective Services Act requires certain healthcare and other professionals to report the information, other persons or entities who have reasonable cause to believe the vulnerable adult is subject to exploitation, such as the bank here, are not under that mandate. They may report the information, but are not required to do so.

Statutes "should be considered in light of other statutory provisions and the nature of the subject matter." *G.S. v. Dep't of Human Servs.,* 157 *N.J.* 161, 172, 723 *A.*2d 612 (1999). "When interpreting different statutory provisions, we are obligated to make every effort to harmonize them, even if they are in apparent conflict." *In Re: Gray–Sadler,* 164 *N.J.* 468, 485, 753 *A.*2d 1101 (2000).

As noted, the amendment to *N.J.S.A.* 52:27D–409 was passed in 2009. *N.J.S.A.* 17:16T–1 to –4 has been on the books since 1998. The Legislature was aware when it passed the amendment to *N.J.S.A.* 52:27D–409 that *N.J.S.A.* 17:16T–1 to –4 also addressed reporting of the exploitation of elderly or vulnerable individuals. *See Mahwah Twp. v. Bergen Cnty. Bd. of Taxation,* 98 *N.J.* 268, 279, 486 *A.*2d 818 (1985) (legislature presumed to be aware of existing legislation at time of passage of subsequent legislation). In passing the 2009 amendment to the Adult Protective Services Act, the Legislature could have required financial institutions to report exploitation of their customers by including financial institutions under *N.J.S.A.* 52:27D–409(a)(1). It did not do so. It could also have made the language of *N.J.S.A.* 17:16T–1 to –4 mandatory at the time it amended the Adult Protective Services Act. Again, it did not take that action. Indeed, when the Adult Protective Services Act is read in *pari materia* with the provisions of *N.J.S.A.* 17:16T–1 to –4, a finding that the reporting provision of the latter statute is discretionary rather than mandatory comports with the purposes of the entire legislative scheme.

## II.

Consequently, because *N.J.S.A.* 17:16T–1 to –4 creates no statutory duty on the bank to report suspected abuse, the court finds that plaintiff has no private cause of action against the bank for its failure to report.

 In New Jersey, courts are reluctant to infer a private right of action where the Legislature has not expressly provided for such an action in the statute. *R.J. Gaydos Ins. Agency, Inc. v. Nat'l Consumer Ins. Co.*, 168 *N.J.* 255, 271, 773 *A.*2d 1132 (2001). When no such private cause of action is expressly set forth in the statute, as in this case, the Court has adopted the factors set forth in the United States Supreme Court's decision in *Cort v. Ash*, 422 *U.S.* 66, 95 *S.Ct.* 2080, 45 *L.Ed.*2d 26 (1975) to determine if such a cause of action is implied. *In re: State Comm'n of Investigation*, 108 *N.J.* 35, 41, 527 *A.*2d 851 (1987). Thus, to determine if a statute confers a private right of action, the court considers: (1) whether the plaintiff is a member of the class for whose special benefit the statute was enacted; (2) whether there is any evidence that the Legislature intended to create a private right of action under the statute; and (3) whether a private cause of action would be consistent with the underlying purposes of the legislative scheme. *Ibid.* "Although courts give varying weight to each one of those factors, the primary goal has almost invariably been a search for the underlying legislative intent." *R.J. Gaydos Ins. Agency, Inc., supra,* 168 *N.J.* at 272–73, 773 *A.*2d 1132 (internal quotation marks omitted). Here, none of these factors are present.

 The statute was enacted for the special benefit of financial institutions—to give financial institutions guidance in how much information may be released and the entities to which they may release such information. It provides a safe harbor against lawsuits based upon the institution's actions. While creating this immunity may serve as an incentive for the financial institution to disclose suspected abuse to the authorities, and in that sense it

also benefits elderly and vulnerable customers, the principal benefit of *N.J.S.A.* 17:16T–1 to –4 is afforded to financial institutions.

The statute is entirely silent as to whether the Legislature intended to create a private right of action under this statute. And based on the analysis set forth previously, the court finds no basis to infer that the Legislature intended to create such a private cause of action. The statute's purpose is to immunize financial institutions, not to make them more susceptible to lawsuits.

One final point. *N.J.S.A.* 17:16T–4(b) gives a bank a safe harbor when it decides "in good faith not to disclose information that it is permitted to disclose under this act regarding the account relationship of a senior or vulnerable customer . . . ." If the bank acts in good faith, it "shall not be liable under any law or regulation or common law of this State for the decision." This creates an affirmative defense for the bank, not a cause of action for the bank's customer.

For example, assume that plaintiff had prevailed on the first count of her complaint, which is for negligence.[3] Then, *N.J.S.A.* 17:16T–4(b) would become an affirmative defense, and Wells Fargo would have had the burden of proving that it acted in good faith to avoid liability. That is not what occurred here, however. The negligence claim asserted by plaintiff has been dismissed. No other violation of a law or regulation has been asserted or proved. In such a circumstance, *N.J.S.A.* 17:16T–1 to –4 simply does not apply. Plaintiff is seeking to turn a potential affirmative defense into a cause of action for breach of a duty. That is not consistent with the intent or plain language of the statute.

Accordingly, this court concludes that the legislative intent was that expressed by the plain language of *N.J.S.A.* 17:16T–1 to –4,

---

[3] As previously noted, the pretrial judge dismissed the plaintiff's negligence count prior to trial. The judge recognized a common law duty to protect older and vulnerable adults, but ruled that the Uniform Commercial Code, *N.J.S.A.* 12A:1–101 to 12–26, preempted to common law duty as it applied to the bank.

which renders the decision to report or not to report discretionary upon the financial institution. The Legislature did not intend to create a statutory cause of action for the customer in the event the financial institution does not report suspected abuse. To arrive at such a conclusion would render the reporting requirements of *N.J.S.A.* 17:16T–1 to –4 mandatory, contrary to the express language of the statute, and further, would result in reporting requirements of *N.J.S.A.* 17:16T–1 to –4 being inconsistent with those in the Adult Protective Services Act.

The complaint is dismissed.