SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**Christa Robey v. SPARC Group LLC** (A-50-22) (087981)

**Argued November 6, 2023 -- Decided March 25, 2024**

**SOLOMON, J., writing for the Court.**

The core issue in this appeal is whether plaintiffs -- a class of shoppers at the retail clothing store Aéropostale -- have sufficiently pled that they sustained an ascertainable loss caused by the alleged "illusory discounts" offered by defendant SPARC Group LLC -- the owner and operator of Aéropostale -- to withstand defendant's motion to dismiss their claims under the Consumer Fraud Act (CFA), N.J.S.A. 56:8-1 to -227, the Truth in Consumer-Contract, Warranty and Notice Act (TCCWNA), N.J.S.A. 56:12-14 to -18, and various common law contract rights.

Plaintiffs' allegations include purchasing a sweatshirt for $23.98 that was advertised as being 60% off an original price of $59.95, and three t-shirts advertised as "Buy 1 Get 2 Free" for $29.95. Plaintiffs claim that the items they purchased are never offered for purchase at the "original" or reference prices listed on the price tag, thereby rendering the advertised "markdowns" illusory and the reference prices fictitious. Plaintiffs allege that such practices violate the CFA, TCCWNA, and several common law contract rights. They seek damages and injunctive relief.

Defendant moved to dismiss plaintiffs' complaint. The trial court granted defendant's motion, observing that the CFA "unmistakably makes a claim of ascertainable loss a prerequisite for a private cause of action." The court found that plaintiffs failed to plead sufficient facts to establish ascertainable loss -- either an "out-of-pocket" loss or a loss of the "benefit of [their] bargain" -- under the CFA or the violation of a "clearly established legal right" under TCCWNA.

The Appellate Division reversed. 474 N.J. Super. 593, 598 (App. Div. 2023). The majority found that plaintiffs were denied the benefit of their bargain because they "received no value for the offered discount." Id. at 601-02. The court further held that, because plaintiffs had adequately alleged that they suffered an ascertainable loss for CFA purposes, they had also sufficiently pled that they were "aggrieved consumers" for purposes of TCCWNA and that their other claims should proceed as well Id. at 603-05. The concurrence agreed that plaintiffs' claims should survive but under a theory of out-of-pocket loss. Id. at 606-07.

1

The Court granted defendant's petition for certification.  254 N.J. 202 (2023).

**HELD:**  A plaintiff can establish an ascertainable loss by demonstrating either an out-of-pocket loss or a deprivation of the benefit of one's bargain.  The Court does not find either type of ascertainable loss applicable here because plaintiffs purchased non-defective, conforming goods with no objective, measurable disparity between the product they reasonably thought they were buying and what they ultimately received.  Plaintiffs' CFA claim therefore fails, and, absent an ascertainable loss pursuant to the CFA, plaintiffs are not "aggrieved consumers" under TCCWNA, cannot show injury or damages under their common law claims, and are without claims entitling them to equitable relief.

1.  In addition to proscribing certain commercial practices, the CFA provides a private right of action through which individuals who have fallen victim to a practice made unlawful by the statute may seek redress.  See N.J.S.A. 56:8-19.  To state a claim under that statute, an individual must plead an unlawful practice, an ascertainable loss, and a causal relationship between the two.  An asserted "ascertainable loss" must be quantifiable or measurable, not hypothetical or illusory.  The Court reviews examples from case law.  (pp. 13-18)

2.  Here, the Appellate Division correctly found that plaintiffs have adequately pled allegations of deceptive conduct that violates the CFA because the complaint sufficiently asserts that the discounts offered were illusory and defendant utilized a fictitious former price in violation of N.J.S.A. 13:45A-9.6(a) ("Use of a fictitious former price will be deemed to be a violation of the [CFA].").  The Court does not disturb that aspect of the Appellate Division's decision.  (pp. 18-19)

3.  But plaintiffs' CFA claim nevertheless fails because they have not pled facts sufficient to allege ascertainable loss, whether as a loss of the benefit-of-the-bargain or an out-of-pocket loss.  Plaintiffs contend that (1) they would not have purchased the items but for the use of fictitious former pricing, entitling them to damages equal to the purchase prices; or (2) they did not receive the value of what was promised, entitling them to damages equal to the difference between the fictitious "original price" and the price they actually paid.  But plaintiffs do not claim that they attempted to return the items or that Aéropostale refused to accept such a return.  The facts as pled are thus insufficient to establish an out-of-pocket loss.  Plaintiffs also argue that they suffered an ascertainable loss because they did not receive a higher-value item for a discounted price, which denied them the benefit of their bargain.  But, unlike in past cases in which a defect was alleged, plaintiffs purchased and received clothing that was not defective or damaged or worth less than they paid.  Although plaintiffs thought they were receiving clothes that defendant once sold for more money, the goods plaintiffs received are exactly what they knowingly purchased -- functioning and usable pants, sweatshirts, and t-shirts.  Indeed,

2

plaintiffs do not argue that the items were worth less than the amount they paid. Plaintiffs thus fail to state a claim for relief under the CFA. (pp. 19-25)

4. To state a TCCWNA claim under the facts presented here, plaintiffs would need to establish four elements: (1) defendant is a seller (2) who, in writing, entered into a consumer contract or gave or displayed a consumer warranty, notice, or sign (3) containing a provision that violates a consumer's "clearly established legal right," (4) and plaintiffs are consumers who were thereby "aggrieved." See N.J.S.A. 56:12-15. A consumer must have suffered adverse consequences as a result of the defendant's regulatory violation" to be "aggrieved" within the meaning of TCCWNA. Here, plaintiffs' alleged harm is premised on the same allegations as their CFA claim -- use of a fictitious former price. Because plaintiffs have not incurred an ascertainable loss due to the violation of the fictitious former pricing regulation, plaintiffs are not monetarily aggrieved for purposes of TCCWNA under the facts pled and therefore cannot state a claim under TCCWNA. (pp. 25-28)

5. The Court explains why plaintiffs' common law claims for money damages fail. Plaintiffs' claim for injunctive relief under the CFA also fails because a plaintiff must suffer "an ascertainable loss" to sustain a private cause of action. In effect, the CFA permits only the Attorney General to bring actions for purely injunctive relief. The Attorney General, who supported plaintiffs in this matter as amicus, may thus directly challenge defendant's conduct as alleged here. (pp. 28-31)

**REVERSED. The order dismissing the complaint is REINSTATED.**

**JUSTICE FASCIALE, dissenting,** cites (1) the CFA's strong remedial purpose to protect consumers, (2) the Legislature's intent to cement the CFA as one of the strongest consumer protection laws in the nation, (3) case precedents, (4) consumer behavior research, and (5) the insight provided by the Attorney General appearing as amicus, in expressing the view that plaintiffs here have sufficiently pleaded that they suffered an ascertainable loss under a benefit-of-the-bargain theory by showing a loss measurable and quantifiable as the difference between the reference price on the products and the amount they actually purchased the products for. Justice Fasciale is also of the view that plaintiffs here suffered an out-of-pocket loss that is ascertainable -- i.e., the purchase price of the clothing items -- because they allege that "they would not have purchased the [clothing] items at the prices they paid had they known the items had not been regularly offered or sold at the higher list price" and because no attempt to return the items was necessary.

**CHIEF JUSTICE RABNER and JUSTICES PATTERSON and PIERRE-LOUIS join in JUSTICE SOLOMON's opinion. JUSTICE FASCIALE filed a dissent in which JUSTICES WAINER APTER and NORIEGA join.**

3

SUPREME COURT OF NEW JERSEY

A-50 September Term 2022

087981

Christa Robey and Maureen
Reynolds, on behalf of
themselves and all others.

similarly situated,

Plaintiffs-Respondents,

v.

SPARC Group LLC,

Defendant-Appellant.

On certification to the Superior Court,
Appellate Division, whose opinion is reported at
474 N.J. Super. 593 (App. Div. 2023).

| Argued | Decided |
|---|---|
| November 6, 2023 | March 25, 2024 |

Michael D. Meuti (Benesch, Friedlander,
Coplan & Aronoff) of the Ohio, California, and District
of Columbia bars, admitted pro hac vice, argued the
cause for appellant (Sills Cummis & Gross, and Benesch,
Friedlander, Coplan & Aronoff, attorneys; Jeffrey J.
Greenbaum, Charles J. Falletta, Michael S. Carucci,
Michael D. Meuti, Stephanie A. Sheridan and Meegan B.
Brooks (Benesch, Friedlander, Coplan & Aronoff) of the
California bar, admitted pro hac vice, of counsel and on
the briefs).

Stephen P. DeNittis argued the cause for respondents (DeNittis Osefchen Prince, attorneys; Stephen P. DeNittis, Joseph A. Osefchen, and Shane T. Prince, on the brief).

Jeffrey S. Jacobson argued the cause for amici curiae the Chamber of Commerce of the United States of America and the New Jersey Civil Justice Institute (Faegre Drinker Biddle & Reath, attorneys; Jeffrey S. Jacobson and Jennifer G. Chawla, on the brief).

Viviana Hanley, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Matthew Platkin, Attorney General, attorney; Jeremy M. Feigenbaum, Solicitor General, and Angela Cai, Deputy Solicitor General, of counsel, and Viviana Hanley, Zeyad A. Assaf, and Monica E. Finke, Deputy Attorneys General, on the brief).

Jared M. Placitella argued the cause for amicus curiae New Jersey Association for Justice (Cohen, Placitella & Roth, attorneys; Jared M. Placitella, of counsel and on the brief).

Christopher S. Porrino submitted a brief on behalf of amici curiae National Retail Federation and Retail Litigation Center, Inc. (Lowenstein Sandler, attorneys; Christopher S. Porrino and Peter Slocum, on the brief).

---

JUSTICE SOLOMON delivered the opinion of the Court.

---

In this case, plaintiffs, a class of shoppers at the retail clothing store Aéropostale, allege that the store advertised clothing as being discounted when, in fact, the items had never been offered or sold at the non-discounted prices, or reference prices, listed. Plaintiffs contend that this practice of

2

"illusory discounts" violates the Consumer Fraud Act (CFA), N.J.S.A. 56:8-1 to -227, the Truth in Consumer-Contract, Warranty and Notice Act (TCCWNA), N.J.S.A. 56:12-14 to -18, and various common law contract rights.

It is a violation of the CFA to use fraud, deception, or misrepresentation in connection with the sale and advertisement of merchandise. Indeed, the Appellate Division found here -- and defendant SPARC Group LLC does not contest -- that defendant's conduct violates the CFA.

However, to state a CFA claim, private plaintiffs -- in contrast to the Attorney General -- must show that they suffered an "ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any . . . practice declared unlawful under" the CFA. N.J.S.A. 56:8-19; Meshinsky v. Nichols Yacht Sales, Inc., 110 N.J. 464, 473 (1988). The core issue before this Court is whether plaintiffs have sufficiently pled that they sustained an ascertainable loss -- that is, a "loss that is quantifiable or measurable." Thiedemann v. Mercedes-Benz USA, LLC, 183 N.J. 234, 248 (2005).

A plaintiff can establish an ascertainable loss by demonstrating either an out-of-pocket loss or a deprivation of the benefit of one's bargain. Ibid. "Out-of-pocket damages represent the difference between the price paid and the

3

actual value received," while "benefit-of-the-bargain principles allow 'recovery for the difference between the price paid and the value of the property had the representations been true.'" <u>Finderne Mgmt. Co. v. Barrett</u>, 402 N.J. Super. 546, 574 (App. Div. 2008) (quoting <u>Correa v. Maggiore</u>, 196 N.J. Super. 273, 284 (App. Div. 1984)).  The trial court determined that plaintiffs could not show either form of ascertainable loss and dismissed their complaint; the Appellate Division reversed, although the appellate court split as to the applicable form of loss.

We do not find either type of ascertainable loss applicable here. Plaintiffs cannot assert a "quantifiable or measurable" loss because they purchased non-defective, conforming goods with no objective, measurable disparity between the product they reasonably thought they were buying and what they ultimately received.  Plaintiffs' CFA claim therefore fails.

Additionally, absent an ascertainable loss pursuant to the CFA, plaintiffs are not "aggrieved consumers" under TCCWNA, cannot show injury or damages under their common law claims, and are thus without claims entitling them to equitable relief.

We therefore reverse the judgment of the Appellate Division and reinstate the trial court's order dismissing the complaint.

I.

A.

In June 2021, plaintiffs, on behalf of themselves and all others similarly situated, filed a six-count class action complaint against defendant SPARC Group LLC, owner and operator of Aéropostale. The complaint details that plaintiff Christa Robey purchased a sweatshirt for $23.98 that was advertised as being 60% off an original price of $59.95, and three t-shirts advertised as "Buy 1 Get 2 Free" for $29.95. Plaintiff Maureen Reynolds purchased a pair of pants for $18.25 that were advertised as being 50% off an original price of $36.50. Plaintiffs claim that the items they purchased "on sale" are never offered for purchase at the "original" or reference prices listed on the price tag, thereby rendering the advertised "markdowns" illusory and the reference prices fictitious.

Count One of plaintiffs' complaint alleges that such false advertisements violate the CFA because they are an "unconscionable commercial practice" proscribed in N.J.S.A. 56:8-2 and because they contravene certain state and federal pricing regulations. Plaintiffs seek treble damages, reasonable attorneys' fees, and filing fees and costs under the CFA. Count Two alleges that defendant violated TCCWNA by offering illusory discounts via "consumer notices," i.e., signs and price tags. Plaintiffs seek statutory damages of $100

5

per class member, as well as actual damages and attorney's fees under TCCWNA. Counts Three, Four, and Five allege breaches of contract, the implied covenant of good faith and fair dealing, and express warranty, respectively. Finally, plaintiffs seek a declaratory judgment and class-wide injunctive relief under the Uniform Declaratory Judgment Act, N.J.S.A. 2A:16-50 to -62.

Defendant moved to dismiss plaintiffs' complaint pursuant to Rule 4:6-2(e). The trial court granted defendant's motion, observing that the CFA "unmistakably makes a claim of ascertainable loss a prerequisite for a private cause of action."

The court found plaintiffs failed to plead sufficient facts to establish either an "out-of-pocket" loss or a loss of the "benefit of [their] bargain." First, the trial court found that there was no out-of-pocket loss given that plaintiffs did not receive "products that were unsuitable for their intended use, or [plead] that they needed to incur extra expenses because of defendant's alleged misrepresentations." Second, absent a showing that the goods were defective, nonconforming, or worth less than what plaintiffs paid, the trial court determined the losses were illusory and hypothetical under the benefit-of-the-bargain theory. Thus, the court found no ascertainable loss under the CFA.

6

The trial court concluded that, without an ascertainable loss under the CFA, the violations of the CFA alleged cannot form the basis of a violation of a "clearly established legal right" under TCCWNA. The court also found that the federal and state pricing regulations on which plaintiffs rely do not provide a private cause of action and therefore could not form the basis of a claim under TCCWNA. Finally, the court found that plaintiffs had not pled facts sufficient to invoke N.J.A.C. 13:45-9.6, which proscribes the use of "fictitious former prices" to make an offered price seem more appealing. Finding that plaintiffs had not shown that defendant violated a clearly established legal right, the trial court determined that plaintiffs "received the exact merchandise that they bargained for at prices they agreed to pay" and were thus not "aggrieved consumers." Therefore, the trial court found that plaintiffs' TCCWNA claim necessarily failed.

B.

The Appellate Division disagreed and reversed the trial court's judgment. Robey v. SPARC Grp. LLC, 474 N.J. Super. 593, 598 (App. Div. 2023).

The Appellate Division held that plaintiffs sufficiently pled an ascertainable loss under the CFA, finding that plaintiffs were denied the benefit of their bargain and suffered a "real and quantifiable" loss -- in the

7

amount of the supposed markdowns, or "illusory discounts" -- because they "received no value for the offered discount." Id. at 601-02, 606. The court further held that, because plaintiffs had adequately alleged that they suffered an ascertainable loss for CFA purposes, they had also sufficiently pled that they were "aggrieved consumers" for purposes of TCCWNA. Id. at 603. Noting that the trial court's dismissal of plaintiffs' common law claims rested on its conclusion that plaintiffs had failed to adequately plead deprivation of the benefit-of-the-bargain, the Appellate Division reversed as to those counts as well. Id. at 603-04. Finally, the appellate court held that it was error to dismiss plaintiffs' claims for a declaratory judgment and injunctive relief. Id. at 604-05.

Judge Berdote Byrne concurred in the judgment, agreeing that plaintiffs' pleadings were adequate but expressed the view that they demonstrated an out-of-pocket loss, not the loss of the benefit of a bargain. Id. at 606-07 (Berdote Byrne, J.S.C. (temporarily assigned), concurring). Judge Berdote Byrne explained that "plaintiffs suffered an ascertainable loss and monetary damages [insofar as] they would not have purchased the items . . . had they known the items had not been regularly offered at the higher list price." Id. at 608 (omission in original). Thus, in Judge Berdote Byrne's view, plaintiffs "do not have the right to receive the difference between their out-of-pocket costs and

8

the fictitiously advertised price," which "would put plaintiffs in a significantly better economic position than they would have been in this situation," but instead have a right to a refund of the purchase prices they paid, which would place plaintiffs "in the same economic position they were prior to the litigation."  Id. at 608-09.

We granted defendant's petition for certification.  254 N.J. 202 (2023). We also granted leave to participate as amici curiae to the National Retail Federation, the Retail Litigation Center, the Chamber of Commerce of the United States, the New Jersey Civil Justice Institute, the Attorney General of New Jersey, and the New Jersey Association for Justice.

## II.

### A.

Before us, defendant argues that consumers do not suffer an ascertainable loss when they receive a non-defective and as-advertised product at the agreed-upon price and do not allege that the products purchased are substantively different or worth less than what they believed they purchased. Defendant maintains that plaintiffs did not suffer a loss under the benefit-of-the-bargain theory of damages because they received the exact items that they sought to buy at the prices they sought to pay.  Similarly, defendant contends that plaintiffs' out-of-pocket theory of loss fails because the items are not

9

worthless and because plaintiffs do not allege that they paid more than the goods are worth. Thus, defendant argues that plaintiffs' CFA claims must fail even though defendant does not challenge the Appellate Division's determination that the pricing practices at issue violate the CFA.

Defendant likewise argues that, because plaintiffs have not shown that they suffered an ascertainable loss under the CFA, plaintiffs are necessarily not "aggrieved consumers" under TCCWNA. Defendant further maintains that plaintiffs' common law contract claims must fail because they did not suffer any loss. Lastly, defendant contends that, without a viable claim for damages, plaintiffs have no basis for relief under the Uniform Declaratory Judgment Act.

The National Retail Federation and the Retail Litigation Center jointly represent that many courts in other jurisdictions have held that the loss of a discount is not an ascertainable loss if the goods were conforming and worth their advertised value. The Chamber of Commerce and the New Jersey Civil Justice Institute claim that defendant's conduct did not violate the fictitious former pricing regulation, N.J.A.C. 13:45A-9.6(a).

B.

Plaintiffs urge the Court to uphold the Appellate Division's determination that they have stated viable claims under the CFA -- and thus, by extension, under TCCWNA and the common law. As to ascertainable loss,

10

plaintiffs claim that (1) the average consumer reasonably interprets prices to represent the quality and value of goods sold; (2) the goods they purchased were never sold at the reference prices indicated; (3) they purchased the goods in reliance on misrepresentations; and (4) the true objective quality, value, and worth of the goods purchased is less than what the reference prices represented.

Plaintiffs claim that they have adequately pled benefit-of-the-bargain damages by declaring that the goods purchased lacked the objective value and quality the reference prices represented; they seek damages measured by the difference between the purchase prices and the reference prices. Additionally, plaintiffs assert that they have sufficiently pled out-of-pocket losses by stating that defendant's misrepresentations induced them to make purchases they would not have made and to pay more for the goods than they otherwise would have had they known the goods' true value.

The Attorney General primarily argues that plaintiffs suffered benefit-of-the-bargain damages and should be allowed to seek injunctive relief on behalf of other consumers.

III.

We are mindful that this matter is before us on a <u>Rule</u> 4:6-2(e) motion to dismiss for failure to state a claim, which requires us to review de novo "the

11

legal sufficiency of the facts alleged on the face of the complaint." Baskin v. P.C. Richard & Son, LLC, 246 N.J. 157, 171 (2021) (quoting Dimitrakopoulous v. Borrus, Goldin, Foley, Vignuolo, Hyman & Stahl, P.C., 237 N.J. 91, 107 (2019)). The test for determining the adequacy of a pleading is "whether a cause of action is 'suggested' by the facts," giving the pleader the benefit of every reasonable inference. Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 746 (1989) (quoting Velantzas v. Colgate-Palmolive Co., 109 N.J. 189, 192 (1988)). In doing so, we must search the complaint "thoroughly 'and with liberality to ascertain whether the fundament of a cause of action may be gleaned even from an obscure statement of claim, opportunity being given to amend if necessary.'" Baskin, 246 N.J. at 171 (quoting Printing Mart, 116 N.J. at 746).

CFA claims (and TCCWNA claims premised upon CFA claims) are "essentially . . . fraud claim[s]," Hoffman v. Hampshire Labs, Inc., 405 N.J. Super. 105, 112 (App. Div. 2009), and are accordingly subject to the heightened pleading standard in Rule 4:5-8(a), which requires that the "particulars of the wrong . . . shall be stated insofar as practicable." With those standards in mind, we turn first to plaintiffs' CFA claims.

12

IV.

A.

Enacted in 1960, L. 1960, c. 39, the CFA provides for relief to consumers who have been harmed by fraudulent practices in the marketplace by making the use of those practices "unlawful," Furst v. Einstein Moomjy, Inc., 182 N.J. 1, 11 (2004).  To that end, the CFA broadly prohibits the use of "unconscionable or abusive" commercial practices, as well as "deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely" thereon.  N.J.S.A. 56:8-2.  We have interpreted the CFA to protect against three forms of unlawful practices:  "knowing misrepresentations, omissions of material fact, and violations of administrative regulations." Furst, 182 N.J. at 11.  Relevant here, the "[u]se of a fictitious former price" violates N.J.A.C. 13:45A-9.6(a), a regulation promulgated under the CFA, and is therefore made unlawful by the statute.

In addition to proscribing certain commercial practices, the CFA provides a private right of action through which individuals who have fallen victim to a practice made unlawful by the statute may seek redress:

> Any person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act or practice declared unlawful under this act . . . may

13

> bring an action . . . .  In any action under this section the court shall, in addition to any other appropriate legal or equitable relief, award threefold the damages sustained by any person in interest.
>
> [N.J.S.A. 56:8-19.]

To state a claim under the CFA, an individual must plead an unlawful practice, an ascertainable loss, and a causal relationship between the two. Bosland v. Warnock Dodge, Inc., 197 N.J. 543, 557 (2009) (citing Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co., Inc., 192 N.J. 372, 389 (2007)).

N.J.S.A. 56:8-19 specifically refers to an "ascertainable loss of moneys or property, real or personal."  In construing the meaning of "ascertainable loss," we have held that the loss must be "'quantifiable or measurable,' not 'hypothetical or illusory.'"  D'Agostino v. Maldonado, 216 N.J. 168, 185 (2013) (quoting Thiedemann, 183 N.J. at 248).  In other words, private plaintiffs need to "demonstrate a cognizable and calculable claim of loss due to the alleged CFA violation."  Thiedemann, 183 N.J. at 249.  As we explained in Thiedemann, "an 'estimate of damages, calculated within a reasonable degree of certainty' will suffice to demonstrate an ascertainable loss."  Ibid. (quoting Cox v. Sears Roebuck & Co., 138 N.J. 2, 22 (1994)).

In CFA cases alleging fraud, misrepresentation, or deception in selling or advertising, demonstrating "either out-of-pocket loss or . . . loss in value will

14

suffice to meet the ascertainable loss hurdle and will set the stage for establishing the measure of damages." Id. at 248. As we noted in D'Agostino, ascertainable loss and damages are separate concepts. 216 N.J. at 192 ("There is no calculation of 'damages sustained' unless the ascertainable loss requirement is first satisfied.").

A consumer suffers an immediate, out-of-pocket loss or expense when an item purchased is essentially unusable for its intended purpose or causes buyers to incur additional costs. For example, in Lee v. Carter-Reed Co., LLC, the consumer plaintiffs were misled into purchasing diet pills based on the seller's representations of their effectiveness; the pills did not work. 203 N.J. 496, 510-11 (2010). We held that, subject to proving the drugs' defects at trial, the plaintiffs pled an out-of-pocket ascertainable loss of the full purchase price of each bottle because the goods were allegedly "worthless" for their advertised purpose. Id. at 527-28. Lee applied the principle that the entire purchase price of an item is recoverable as an out-of-pocket loss when a seller misrepresents the item's essential qualities and the item received is ultimately worthless for its intended purpose. Ibid.

Conversely, in Thiedemann, we held that customers whose vehicles were repaired under warranty, at no cost to the customers, did not sustain an out-of-pocket loss because there was no difference between the purchase price and the

15

value received after the cars were repaired. 183 N.J. at 251-53. Also illustrative is <u>Meshinsky</u>, in which we held that a prospective buyer did not suffer an out-of-pocket loss caused by a seller's forgery of the buyer's signature on a loan application because the buyer never made a payment on the transaction and the seller eventually repaid the bank. 110 N.J. at 475 n.4.

When a consumer claims that there is a difference in value between an item as advertised and the item as delivered, but the item is not worthless, the benefit-of-the-bargain theory of damages is applicable. <u>Mladenov v. Wegmans Food Mkts., Inc.</u>, 124 F. Supp. 3d 360, 375 (D.N.J. 2015) ("A benefit-of-the-bargain theory requires that the consumer be misled into buying a product that is ultimately worth less than the product that was promised."). That is, a consumer suffers a benefit-of-the-bargain loss when the consumer receives less than what was bargained for.

For example, in <u>Thiedemann</u>, the plaintiffs purchased Mercedes-Benz vehicles sold with defective fuel gauges. 183 N.J. at 240. The company repaired the defect for free under warranty, but the plaintiffs sued and alleged that receipt of the defective vehicle violated the CFA and deprived them of the benefit of their bargain, i.e., a non-defective vehicle. <u>Id.</u> at 243, 250. We disagreed and granted summary judgment in favor of Mercedes-Benz. <u>Id.</u> at 255. Stressing that "[t]he ascertainable loss requirement operates as an

16

integral check upon the balance struck by the CFA between the consuming public and sellers of goods," we reasoned that the bargain between the parties in that case anticipated and provided for the possibility of defects by including free warranty service to ensure that the vehicles remained fully operable. Id. at 251. Because Mercedes-Benz cured the defect pursuant to the bargained-for warranty, the consumers were not deprived of an operable vehicle. Ibid. We rejected, and deemed "too speculative," the plaintiffs' argument that there is a future hypothetical diminution in the vehicle's value because it once needed a fuel gauge replaced. Id. at 252.

The court in Smajlaj v. Campbell Soup Co. also focused on what the consumer received in a transaction to determine whether it was objectively less than what the consumer bargained for. 782 F. Supp. 2d 84, 99 (D.N.J. 2011). There, the plaintiffs suffered a benefit-of-the-bargain loss when they purchased canned soup that was falsely advertised as having "25% less sodium" than regular soup but did not actually contain less sodium. Ibid. That was sufficient to establish a benefit-of-the-bargain loss because the plaintiffs did not receive what was promised, i.e., reduced-sodium soup. Ibid. Thus, in both Thiedemann and Smajlaj, the courts compared what consumers actually received to what they could objectively expect to receive, based on their

17

bargain, to determine whether the allegations were sufficient to show an "ascertainable loss."

The dissent cites dicta in <u>Smajlaj</u> to support its erroneous contention that an illusory loss may constitute ascertainable damages under the CFA. <u>Post</u> at ___ (slip op. at 18 ). There was no such illusory loss in <u>Smajlaj</u>; there, the plaintiffs did not receive the product that they bargained for -- soup containing the promised "25% less sodium." 782 F. Supp. 2d at 99.

Similarly, the dissent mistakenly cites to <u>Bosland</u>, <u>post</u> at ___ (slip op. at 16), in support of its contention that plaintiffs' loss was not illusory. In <u>Bosland</u>, the purchaser of a motor vehicle was charged a $117 nonitemized service fee that included an undisclosed document service fee, in violation of the CFA and TCCWNA. 197 N.J. at 548. The issue before the Court concerned whether a demand for refund of the overcharge was required as a prerequisite to establishing an ascertainable loss; it was not. <u>Id.</u> at 561. The amount of the loss was easily quantifiable -- the amount of the overcharge.

Notwithstanding the liberality of the construction afforded the CFA, ascertainable means ascertainable -- "quantifiable or measurable," <u>D'Agostino</u>, 216 N.J. at 185 (quoting <u>Thiedemann</u>, 183 N.J. at 248) -- and illusory means illusory.

18

B.

Here, plaintiffs' CFA claim fails because they cannot show either a loss of the benefit-of-the-bargain or an out-of-pocket loss.

The Appellate Division correctly found that plaintiffs have adequately pled allegations of deceptive conduct that violates the CFA because the complaint sufficiently asserts that the discounts offered were illusory and defendant utilized a fictitious former price. Robey, 474 N.J. Super. at 600.

Plaintiffs alleged in their complaint that defendant never offered the items purchased at their "reference price," thereby rendering the "reference price" fictitious. Defendant does not contest the Appellate Division's holding that plaintiffs adequately pled that defendant utilized a fictitious former price in violation of N.J.S.A. 13:45A-9.6(a), and we do not disturb that aspect of the Appellate Division's decision. See N.J.S.A. 13:45A-9.6(a) ("Use of a fictitious former price will be deemed to be a violation of the [CFA]."). But plaintiffs have not pled facts sufficient to allege an ascertainable loss.[1]

---

[1] Because we agree with the Appellate Division that the disputed pricing practice violates a regulation promulgated under the CFA, N.J.A.C. 13:45A-9.6(a), we need not reach the question whether plaintiffs have adequately pled violations of the additional state and federal regulations they cite, but do not explain, in support of their claims for relief under the CFA and TCCWNA. Those claims cannot succeed because plaintiffs have not sufficiently pled ascertainable loss or that they are aggrieved consumers, as the CFA and TCCWNA respectively require. Furthermore, the federal regulations cited are guidelines -- "administrative

19

Plaintiffs' pricing claims are inherently different from CFA claims we have considered in the past. See, e.g., Cox, 138 N.J. at 2 (near-worthless repair work performed without necessary permits); Furst, 182 N.J. at 1 (delivery of defective and non-conforming goods). Here, plaintiffs do not allege that they purchased defective or deficient goods, or that the items they received are worthless or even worth less than the price paid. Indeed, plaintiffs do not dispute that the items they bought are precisely what they intended to purchase. Rather, plaintiffs contend that (1) they would not have purchased the items but for the use of fictitious former pricing, entitling them to damages equal to the purchase prices; or (2) they did not receive the value of what was promised, entitling them to damages equal to the difference between the fictitious "original price" and the price they actually paid.

Based on our review of the record, we are satisfied, as was the trial court, that plaintiffs did not plead sufficient facts to establish an ascertainable loss under either theory. Nowhere in the complaint do plaintiffs allege facts supporting an out-of-pocket loss, i.e., that the products they purchased were worthless or unsuitable for their intended use, or that they have spent or will spend additional funds following their purchases to make the items usable for

interpretations of law administered by the Commission for the guidance of the public." The corresponding federal statutory provisions, 15 U.S.C. §§ 45 and 46, do not provide any private right of action.

20

their intended purpose.  See Lee, 203 N.J. at 528 (finding that the plaintiffs suffered an out-of-pocket loss each time a class member purchased a dietary supplement pill that did not provide the benefits represented -- reduction of belly fat -- and was therefore worthless); Cox, 138 N.J. at 22 (finding that the plaintiff suffered an ascertainable loss when an employee of the defendant performed hazardous and shoddy work on the plaintiff's kitchen, requiring the plaintiff to incur the cost of repairing the work).

Instead, plaintiffs allege that they suffered an out-of-pocket loss of the purchase price because they either would not have bought the items at the prices that they ultimately paid, or they would not have purchased the goods at all but for defendant's misleading and deceptive advertising.  Although plaintiffs allege that they never would have purchased the items, plaintiffs do not claim that they attempted to return the items or that Aéropostale refused to accept such a return.  The facts as pled are thus insufficient to establish an out-of-pocket loss.  Accordingly, plaintiffs are not entitled to receive a refund of the purchase prices.

Plaintiffs also argue that they suffered an ascertainable loss because they did not receive a higher-value item for a discounted price, which denied them the benefit of their bargain.  Put another way, plaintiffs allege that they did not receive the savings that defendant advertised.  But plaintiffs do not allege that

21

the items purchased were materially different from what was promised -- wearable pants, t-shirts, and a sweatshirt, as advertised.  Nor have they alleged any dissatisfaction with or defects in the items purchased.  To support their claim of a loss of the benefit of the bargain, plaintiffs rely principally on <u>Furst</u>. The Attorney General would also have us decide this issue on <u>Furst</u> principles. But <u>Furst</u> is inapposite for several reasons.

In <u>Furst</u>, the plaintiff buyer purchased a five-thousand-dollar Ireloom carpet from a retailer at a discounted price, and the retailer delivered a damaged and smaller-than-advertised carpet.  182 N.J. at 8-9.  The defendant offered the plaintiff a refund of the sale price or a similar carpet at an additional cost but refused to replace the carpet with a conforming one at the sale price the plaintiff paid.  <u>Id.</u> at 9.  The plaintiff sued, and the defendant did not contest the trial court's finding that its conduct violated the CFA.  <u>Ibid.</u> The issue on appeal was how to calculate damages after the showing of an ascertainable loss had already been made.  <u>Id.</u> at 9-10.  In other words, <u>Furst</u> concerned the damages recoverable for an ascertainable loss, not whether the plaintiffs suffered a loss in the first place, as is the case here.  <u>Ibid.</u>; <u>see</u> <u>D'Agostino</u>, 216 N.J. at 192 (explaining that loss and damages "have separate functions in the analysis").

We agreed with the trial court and the Appellate Division that "when a merchant violates the [CFA] by delivering defective goods and then refusing to provide conforming goods, a customer's ascertainable loss is the replacement value of those goods." Furst, 182 N.J. at 10. In coming to that conclusion, we considered what measure of damages would make the consumer whole -- the carpet's replacement value (or fair market value), or the discounted purchase price? We held that "[t]he merchant who promises to deliver a product at a particular price must, at the option of the consumer, either deliver the product or render its replacement value." Id. at 14.

In contrast, plaintiffs here are not entitled to benefit-of-the-bargain damages because they suffered no loss -- they purchased and received clothing that was not defective or damaged or worth less than they paid. D'Agostino, 216 N.J. at 192 ("There is no calculation of 'damages sustained' unless the ascertainable loss requirement is first satisfied.") (quoting Thiedemann, 183 N.J. at 247). Furst would be instructive here if the items plaintiffs purchased turned out to be non-conforming or materially different from what they thought they were purchasing. However, plaintiffs have not made those allegations. Although plaintiffs thought they were receiving clothes that defendant once sold for more money, the goods plaintiffs received are exactly what they knowingly purchased -- functioning and usable pants, sweatshirts,

23

and t-shirts.  Indeed, plaintiffs do not argue that the items were worth less than the amount they paid; they do not contend, for example, that the $23.98 sweatshirt was not worth $23.98 or that the $18.25 pants were not worth $18.25.  There is thus no reason to calculate damages under Furst's benefit of the bargain principles.

Like the plaintiffs in Thiedemann, whose loss -- a subjective allegation of their vehicle's diminished value -- was not "ascertainable" within the meaning of the CFA, plaintiffs here objectively received what they paid for. Accordingly, we find that plaintiffs' allegations, assumed to be true, do not establish a cognizable ascertainable loss under a benefit-of-the-bargain theory. This holding is consistent with the majority of decisions by other state and federal courts that have addressed whether plaintiffs suffered a cognizable injury as a result of deceptive pricing under various state consumer protection laws.  See, e.g., Leigh-Pink v. Rio Props., LLC, 512 P.3d 322, 327 (Nev. 2022) ("Where a plaintiff received the value of their purchase, we conclude that they cannot demonstrate that they did not receive the benefit of their bargain or show any out-of-pocket losses, because the value of the goods or services they received is equal to the value that they paid."); Shaulis v. Nordstrom Inc., 865 F.3d 1, 12 (1st Cir. 2017) (finding plaintiffs suffered no loss where the "product itself was [not] deficient in some objectively identifiable way");

24

Gerboc v. Context Logic, Inc., 867 F.3d 675, 681 (6th Cir. 2017) (holding that plaintiff had no "actual damages" under Ohio law because "[plaintiff] got what he paid for: a $27 item that was offered as a $27 item and that works like a $27 item"); Kim v. Carter's Inc., 598 F.3d 362, 364 (7th Cir. 2010) (finding the plaintiffs "got the benefit of their bargain and suffered no harm" under Illinois law when "they agreed to pay a certain price for Carter's clothing, which they do not allege was defective or worth less than what they actually paid"); Hennessey v. Gap, Inc., 86 F.4th 823, 828 (8th Cir. 2023) ("[I[n cases where plaintiff was fraudulently induced to purchase a product that was no different in quality than defendant represented at the time of sale, . . . there is no ascertainable loss under [Missouri law] because the price paid was both the represented value and the value of the product plaintiff received.").

Having determined that plaintiffs have failed to state a claim for relief under the CFA, we turn to their TCCWNA claim.

V.

The Legislature enacted TCCWNA in 1981, L. 1981, c. 454, "to prevent deceptive practices in consumer contracts," Dugan v. TGI Fridays, Inc., 231 N.J. 24, 67 (2017). By passing TCCWNA, the Legislature did not create new legal rights but sought to require sellers to acknowledge already existing "clearly established consumer rights" by providing new remedies for violations

25

of those rights.  See Spade v. Select Comfort Corp., 232 N.J. 504, 515-16 (2018); see also Governor's Statement on Signing A. 1660 (Jan. 11, 1982) (noting that TCCWNA would "strengthen[ ] provisions of the [CFA]").  The rights and responsibilities enforceable by TCCWNA are, therefore, drawn from and established by other legislation.  Shelton v. Restaurant.com, 214 N.J. 419, 432 (2013).

TCCWNA prohibits sellers from engaging in conduct proscribed elsewhere:

> No seller, lessor, creditor, lender or bailee shall in the course of his business offer to any consumer or prospective consumer or enter into any written consumer contract or give or display any written consumer warranty, notice or sign . . . which includes any provision that violates any clearly established legal right of a consumer or responsibility of a seller . . . as established by State or Federal law at the time the offer is made or the consumer contract is signed or the warranty, notice or sign is given or displayed.
>
> [N.J.S.A. 56:12-15.]

It further provides a cause of action through which consumers aggrieved by means of a proscribed practice may seek recovery:  "Any person who violates the provisions of this act shall be liable to the aggrieved consumer for a civil penalty of not less than $100.00 or for actual damages, or both at the election of the consumer, together with reasonable attorney's fees and court costs." N.J.S.A. 56:12-17 (emphasis added).

26

Thus, to state a TCCWNA claim under the facts presented here, plaintiffs would need to establish four elements: (1) defendant is a seller (2) who, in writing, entered into a consumer contract or gave or displayed a consumer warranty, notice, or sign (3) containing a provision that violates a consumer's "clearly established legal right," (4) and plaintiffs are consumers who were thereby "aggrieved." See Pisack v. B & C Towing, Inc., 240 N.J. 360, 379 (2020); N.J.S.A. 56:12-15, -17.

We clarified in Spade that a consumer must have "suffered adverse consequences as a result of the defendant's regulatory violation" to be "aggrieved" within the meaning of TCCWNA. 232 N.J. at 523-24. "In the absence of evidence that the consumer suffered adverse consequences as a result of defendant's regulatory violation, a consumer is not an 'aggrieved consumer' for purposes of" the statute. Id. at 524.

Here, plaintiffs' alleged harm is premised on the same allegations as their CFA claim -- use of a fictitious former price. Because we determine that plaintiffs have not incurred an ascertainable loss of money or property due to the violation of the fictitious former pricing regulation, N.J.A.C. 13:45A-9.6(a), plaintiffs are not monetarily aggrieved for purposes of TCCWNA under

27

the facts pled.[2]  The monetary loss analysis does not yield a different result in this context, and plaintiffs do not allege non-monetary harm.  See id., at 523 (explaining that a consumer may suffer non-monetary harm if, for example, "untimely delivery and misleading 'no refunds' language leaves [the] consumer without furniture needed for a family gathering").  Accordingly, we determine that plaintiffs are not aggrieved consumers and therefore cannot state a claim under TCCWNA.

## VI.

We briefly address plaintiffs' common law claims.  First, to state a claim for breach of contract, a plaintiff must assert that a defendant's alleged breach "caused a loss to the plaintiffs."  Goldfarb v. Solimine, 245 N.J. 326, 338 (2021) (quoting Globe Motor Co. v. Igdalev, 225 N.J. 469, 482 (2016)).  Because plaintiffs here have not alleged an ascertainable loss for the reasons discussed above, their contract claim fails.

Second, to breach the implied covenant of good faith and fair dealing, a defendant must have "engaged in some conduct that denied the benefit of the bargain originally intended by the parties.'"  Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs., 182 N.J. 210, 225 (2005) (emphasis

---

[2]  We reject the invitation by the parties to opine on whether ascertainable loss is coextensive with the "aggrieved consumer" requirement under TCCWNA, non-monetary or otherwise.

28

added).  Again, because plaintiffs received the benefit of their bargain and did not suffer an ascertainable loss, plaintiffs' claim for breach of the implied covenant of good faith and fair dealing fails.

Finally, to state a claim for breach of express warranty, a plaintiff must establish "the failure of the goods to perform as warranted."  Ford Motor Credit Co., LLC v. Mendola, 427 N.J. Super. 226, 242 (App. Div. 2012) (quoting Spring Motors Distribs., Inc. v. Ford Motor Co., 98 N.J. 555, 586 (1985)); see Furst, 182 N.J. at 13 (explaining that damages for breach of an express warranty is "the remedy for a buyer who has accepted defective goods").  Because the items accepted by plaintiffs were not defective or non-conforming, there is no breach of express warranty.

## VII.

Plaintiffs also seek injunctive relief.  To explain why that relief is unavailable -- even though the pricing practices challenged are indeed unlawful under the CFA -- we briefly review the history of the statute.

In its original form, the Legislature vested only the Attorney General with enforcement power under the CFA.  See Weinberg v. Sprint Corp., 173 N.J. 233, 248 (2002) (discussing the broad investigative and enforcement powers the Legislature afforded to the Attorney General to accomplish the objectives of the CFA).  In 1971, however, the Legislature amended the CFA to

29

allow private actions by injured consumers.  L. 1971, c. 247, § 7 (codified at N.J.S.A. 56:8-19).

The addition of a private right of action, as we explained in Weinberg, makes it easier to compensate victims for their actual loss, 173 N.J. at 249, and the treble damages provision punishes the wrongdoer and creates an incentive for attorneys to take cases involving less substantial losses.  Ibid.  As noted previously, however, unlike the Attorney General, a plaintiff must suffer "an ascertainable loss," caused by the unlawful conduct, to sustain a private cause of action under the CFA.  N.J.S.A. 56:8-19.

That rule applies both to claims and to requests for injunctive relief under the CFA.  See Laufer v. U.S. Life Ins. Co., 385 N.J. Super. 172, 185 (App. Div. 2006) ("Once this threshold standing requirement" -- i.e., pleading ascertainable loss -- "is satisfied, the plaintiff can pursue 'all available remedies, including an injunction, . . . even if the plaintiff ultimately loses on his damage claim but does prove an unlawful practice under the Act.'") (quoting Weinberg, 173 N.J. at 253)).  Therefore, although plaintiffs and their amici are technically correct that the CFA relaxes traditional standards for injunctive relief, their ability to act as "private attorneys general," Lemelledo v. Beneficial Mgmt. Corp. of Am., 150 N.J. 255, 268 (1997), is reliant on their ability to plead an ascertainable loss, see Weinberg, 173 N.J. at 250 ("The

30

express language of the statute requires a private party to have a claim that he or she has suffered an ascertainable loss of money or property in order to bring a cause of action under the Act.  In effect, the Act permits only the Attorney General to bring actions for purely injunctive relief.").  Because plaintiffs here cannot plead ascertainable loss, they cannot seek an injunction for themselves, or others similarly situated under the CFA.

We emphasize that the Attorney General, who supported plaintiffs in this matter as amicus, does not need to establish an ascertainable loss to bring an enforcement action to enjoin conduct violative of the CFA and may challenge defendant's conduct as alleged here.  Indeed, the dissent makes a strong case for why the Attorney General should choose to exercise his power and authority to seek a court order prohibiting businesses from employing illusory discounts and fictitious former prices.

## VIII.

For the reasons set forth above, we reverse the Appellate Division's judgment, and reinstate the trial court's order dismissing plaintiffs' complaint.

CHIEF JUSTICE RABNER and JUSTICES PATTERSON and PIERRE-LOUIS join in JUSTICE SOLOMON's opinion.  JUSTICE FASCIALE filed a dissent in which JUSTICES WAINER APTER and NORIEGA join.

31

Christa Robey and Maureen
Reynolds, on behalf of
themselves and all others
similarly situated,

Plaintiffs-Respondents,

v.

SPARC Group LLC,

Defendant-Appellant.

JUSTICE FASCIALE, dissenting.

Imagine going to the mall to buy a coat. You enter your first store, and you find one you like. The price tag says, "70 percent off, originally sold for $1,000." What do you do? You stop shopping and buy the coat. The store presented you with a great deal: pay $300 for a coat worth $1,000. You not only like the coat, but you reasonably believe that the store promised you $700 in savings. You later learn that the store tricked you into buying the coat by misrepresenting its value as $1,000. The fact is that the store never sold the coat for $1,000; they had only sold it for $300. You did not receive the benefit of what you bargained for, nor did you receive what you were promised. Moreover, but for the fake discount, you would not have purchased the coat. Therefore, you suffered a quantifiable and measurable (not merely illusory)

ascertainable loss under a benefit-of-the-bargain theory and, arguably, also under an out-of-pocket loss theory.

That hypothetical is not a fanciful story -- plaintiffs sufficiently pleaded almost identical allegations. The only differences are the clothing items and the amounts paid. Here, the class action complaint should never have been dismissed under Rule 4:6-2(e) for failure to plead ascertainable loss. Respectfully, not only does the majority's decision fail to uphold important and long-standing remedial principles that have guided New Jersey Consumer Fraud Act (CFA) cases for decades, but it also does not adequately consider the precepts we outlined in Furst v. Einstein Moomjy, Inc., 182 N.J. 1 (2004), acknowledge substantial consumer behavior research, or give sufficient weight to the Attorney General's support for plaintiffs' position. Plaintiffs' allegations in their 60-page complaint more than sufficiently demonstrate ascertainable loss. And consequently, plaintiffs should have the opportunity to move past the pleading stage and attempt to prove their CFA allegations, along with their other claims.[1]

Thus, I respectfully dissent.

---

[1] As the appellate court found, because plaintiffs sufficiently pleaded ascertainable loss under a benefit-of-the-bargain theory, their remaining claims should be reinstated as well.

2

I.

When reviewing an order dismissing a complaint for failure to state a claim under Rule 4:6-2(e), we must search "the complaint in depth and with liberality to ascertain whether the fundament of a cause of action may be gleaned even from an obscure statement of claim." Green v. Morgan Props., 215 N.J. 431, 452 (2013) (emphases added) (quoting Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 746 (1989)). At the early pleadings stage in the litigation, we must accept as true the facts as pleaded in the complaint. Smith v. SBC Commc'ns, Inc., 178 N.J. 265, 268-69 (2004). We need not be "concerned with the ability of plaintiffs to prove their allegation[s]." Printing Mart, 116 N.J. at 746 (highlighting that for the purposes of a Rule 4:6-2(e) analysis, "plaintiffs are entitled to every reasonable inference of fact").

Even applying Rule 4:5-8(a)'s requirement that a heightened pleading standard is required on dismissal motions when allegations of fraud exist, the allegations in plaintiffs' lengthy and detailed complaint easily satisfy our heightened pleading rules.

3

II.

A.

Plaintiffs Christa Robey and Maureen Reynolds filed a class action lawsuit against defendant, SPARC Group LLC, alleging a long-standing deceptive pricing scheme perpetrated by Aéropostale -- a retail store that defendant owns and operates.  Plaintiffs pleaded in multiple counts various causes of action including, as pertinent here, that defendant violated the CFA by engaging in affirmative acts (unconscionable commercial practices, deceptive advertising, and misrepresentations) and by violating N.J.A.C. 13:45A-9.6, which provides that "[u]se of a fictitious former price will be deemed to be a violation of the [CFA]."  Plaintiffs Robey and Reynolds further alleged as to their CFA claim that they suffered ascertainable loss because they did not receive "the claimed value of [their] purchase[s]" and that they would not have purchased the items but for the intentionally advertised illusory discounts.

Thus, we are reviewing an order under Rule 4:6-2(e) that dismissed CFA allegations.

B.

When reviewing CFA claims, our Court has repeatedly stressed the CFA's broad remedial purpose and the Legislature's manifest intent in

4

enacting the CFA to protect consumers from fraudulent commercial practices in the marketplace. See Thiedemann v. Mercedes-Benz USA, LLC, 183 N.J. 234, 245 (2005) ("The Legislature enacted the CFA in 1960 to address rampant consumer complaints about fraudulent practices in the marketplace and to deter such conduct by merchants."); All the Way Towing, LLC v. Bucks Cnty. Int'l, Inc., 236 N.J. 431, 434 (2019) (noting that the CFA "is a powerful 'legislative broadside against unsavory commercial practices' in the marketplace" (quoting Real v. Radir Wheels, Inc., 198 N.J. 511, 514 (2009))).

With the CFA's purpose in mind, "[c]ourts have emphasized that like most remedial legislation, the [CFA] should be construed liberally in favor of consumers." Cox v. Sears Roebuck & Co., 138 N.J. 2, 15 (1994) (emphasis added); DeSimone v. Springpoint Senior Living, Inc., ___ N.J. ___, ___ (2024) (slip op. at 11) ("The CFA is remedial legislation, which the 'courts liberally enforce . . . to fulfill its objective to protect consumers from prohibited unconscionable acts by sellers.'" (omission in original) (quoting All the Way Towing, LLC, 236 N.J. at 434)). Failure to faithfully apply the CFA's undisputed remedial purpose harms consumers.

C.

Importantly, plaintiffs are pursuing their claims as private parties under the CFA. The CFA "initially conferred enforcement power exclusively on the

5

Attorney General," <u>Thiedemann</u>, 183 N.J. at 245, but as part of an amendment in 1971, the CFA "authoriz[ed] a private right of action" -- "arguably the greatest expansion of the CFA," <u>DeSimone</u>, ___ N.J. at ___ (slip op. at 12).

N.J.S.A. 56:8-19 authorizes this private right of action and provides that if a party were to succeed in showing "any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act," then a "court shall, in addition to any other appropriate legal or equitable relief, award threefold the damages sustained by any person in interest . . . [and] also award reasonable attorneys' fees, filing fees and reasonable costs of suit."

The private right of action under the CFA cannot be underappreciated or misunderstood. As this Court expressly stated in <u>Bosland v. Warnock Dodge, Inc.</u>, the legislative history reveals that the enactment of the private right of action was intended to make the CFA "<u>one of the strongest consumer protection laws in the nation</u>." 197 N.J. 543, 555 (2009) (emphasis added) (quoting <u>Governor's Press Release for A. 2402</u>, at 1 (Apr. 19, 1971)). It also was intended to "provide easier access to the courts for the consumer." <u>Ibid.</u> (quoting <u>Governor's Press Release for A. 2402</u>, at 2 (June 29, 1971)). We have explicitly recognized that "[t]he private right of action is integral to fulfilling the [CFA's] legislative purposes, and by allowing recovery of

6

attorneys' fees and costs, private attorneys are incentivized to bring CFA claims, thereby reducing the enforcement burdens that otherwise would fall on the State." Sun Chem. Corp. v. Fike Corp., 243 N.J. 319, 330 (2020) (second alteration in original) (internal quotations and citations omitted). Thus, the private cause of action "greatly reduce[s]" "[t]he primary risk of underenforcement" of the CFA, Lemelledo v. Beneficial Management Corp. of America, 150 N.J. 255, 269-70 (1997), and "the burdens on the Division of Consumer Affairs," Cox, 138 N.J. at 15 (quoting Governor's Press Release for A. 2402, at 2 (June 29, 1971)).

Further, the award of attorneys' fees outlined in N.J.S.A. 56:8-19 was to encourage and provide an "incentive for members of the bar to become 'private attorneys general' . . . to enlarge fraud-fighting authority." Perez v. Professionally Green, LLC, 215 N.J. 388, 402 (2013) (omission in original) (quoting Gonzalez v. Wilshire Credit Corp., 207 N.J. 557, 585 (2011)). And importantly, the remedies outlined in N.J.S.A. 56:8-19 are "not only to make whole the victim's loss, but also to punish the wrongdoer and to deter others from engaging in similar fraudulent practices." Furst, 182 N.J. at 12.

This case is particularly illustrative of why the Legislature allowed for private causes of action under the CFA. The Attorney General, an unquestionably integral part of the CFA's enforcement, appeared as amicus

7

curiae in support of plaintiffs' position and advocated at oral argument that there are simply too many fictitious pricing violations in the marketplace for the Attorney General to be able to prosecute them all. Therefore, without private parties like plaintiffs bringing actions against wrongdoers engaging in fictitious pricing schemes, the Attorney General will continue to be burdened, wrongdoers will not be deterred, and these unlawful practices will continue to run rampant in the marketplace, just as studies have reported. Those avoidable pitfalls contravene the CFA's remedial purposes. And as an essential part to the enforcement of the CFA, the Attorney General's position on this issue is profoundly significant, a sentiment the majority fails to meaningfully consider.[2]

D.

Unlike enforcement actions brought by the Attorney General, which do not require a demonstration that the challenged practices caused ascertainable loss to a consumer, it is well-settled that a party pursuing a private cause of action under N.J.S.A. 56:8-19 must demonstrate "(1) an unlawful practice, (2)

---

[2] Clearly the Attorney General has authority to pursue fictitious pricing violations in the marketplace without any showing of ascertainable loss. We understand his participation in this case as amicus to underscore how seriously the Attorney General takes the enforcement of laws prohibiting fictitious pricing schemes.

8

an 'ascertainable loss,' and (3) 'a causal relationship between the unlawful conduct and the ascertainable loss.'" Lee v. Carter-Reed Co., L.L.C., 203 N.J. 496, 521 (2010) (quoting Bosland, 197 N.J. at 557). And importantly, "[i]n considering these requirements, we have been careful to interpret the CFA, and its prima facie proof requirements, so as to be faithful to the [CFA]'s broad remedial purposes." Bosland, 197 N.J. at 555 (emphasis added); see also Thiedemann, 183 N.J. at 247 (noting -- unlike what occurred here -- that "the prima facie proofs necessary for a private cause of action under the CFA must be applied compatibly with the CFA's remedial nature").

That brings me to the important matter at hand. With the above long-standing legal principles in mind -- standards that were generally reiterated in the allegations of the complaint[3] -- plaintiffs successfully pleaded the required elements of a private CFA claim.

_____

[3] For example, plaintiffs' complaint states:

> 179. The [CFA] is a remedial statute which the New Jersey Supreme Court has repeatedly held must be construed liberally in favor of the consumer to accomplish its deterrent and protective purposes. . . .
>
> . . . .
>
> 201. As with other terms of the [CFA], the term "ascertainable loss" is to be construed liberally in favor

9

## III.

First, as the majority holds, plaintiffs sufficiently pleaded "an unlawful practice." Ante at ___ (slip op. at 19). It is well-settled that unlawful practices under the CFA "fall into three general categories: affirmative acts, knowing omissions, and regulation violations." Cox, 138 N.J. at 17. The Division of Consumer Affairs regulations expressly provide that "[u]se of a fictitious former price will be deemed to be a violation of the [CFA]." N.J.A.C. 13:45A-9.6(a). A "fictitious former price" is defined as "an artificially inflated price for an item or items of merchandise established for the purpose of enabling the advertiser to subsequently offer the item or items at a large reduction." N.J.A.C. 13:45A-9.1.

Accepting the allegations in the complaint as true, Robey and Reynolds bought products on sale with the expectations of obtaining promised bargains, but those expectations were never realized. For instance, during one shopping trip to Aéropostale, Robey viewed a sign that falsely advertised a "hoodie" as on sale for 60 percent off of $59.95, the reference price. Relying on these advertised misrepresentations, Robey purchased the "hoodie" at a price of $23.98. Based on the store's purposely misleading sale advertisements and

---

of the consumer in order to carry out the [CFA]'s broad remedial purposes . . . .

10

reference prices, Robey reasonably believed she was purchasing a "hoodie" that was "worth and had the value of $59.95," but at a bargain of $23.98, therefore saving $35.97. Similarly, Reynolds went to Aéropostale and viewed a sign that deceptively advertised pants for 50 percent off, but with an untrue reference price of $36.50. Once again, relying on these misrepresentations, Reynolds purchased the pants for $18.25, believing she obtained a discount of $18.25 and that the pants were valued at $36.50.

What Robey, Reynolds, and other Aéropostale consumers did not know at the time of their purchase was that, as alleged in the complaint, Aéropostale was actively deceiving its consumers about its advertised discounts. After a six-year investigation conducted by plaintiffs' counsel, plaintiffs alleged that the discounts Aéropostale advertised were "always false" and "illusory," and the list or reference prices provided on the clothing's price tags were "false and inflated." Plaintiffs alleged with specificity -- notably, enough to satisfy the heightened pleading standard for fraud cases -- how their investigation revealed that "for most of the products that A[é]ropostale advertise[d] with a discount or with a 'free' offer, A[é]ropostale ha[d] never -- not even for a single day -- offered the product at the list price in its stores without a discount or 'free' offer."

11

I agree with the majority that the Appellate Division correctly found that plaintiffs adequately pleaded -- in my view, well beyond adequately pleaded -- allegations of unconscionable deceptive conduct that violates the CFA. Ante at ___ (slip op. at 19). But it is imperative that I highlight a point the majority has not mentioned: the widespread problem of fictitious pricing in the marketplace nationwide.

According to a recently published research article, "the practice of fictitious pricing within the United States has not gone away but instead 'has proliferated,' is 'prevalent,' and is 'pervasive,'" which the authors of the article note is evident by the fact that there are "dozens of lawsuits" in state and district courts attempting to combat the practice. Richard Staelin, Joel E. Urbany & Donald Ngwe, Competition and the Regulation of Fictitious Pricing, 87 J. of Mktg. 826, 827 (2023) (citations omitted). News outlets have recently reported on fictitious pricing schemes among major companies as well, showing the issue is widespread. See Jaclyn Peiser, A Common, Illegal Tactic Retailers Use to Lure Customers, Wash. Post (Nov. 21, 2023), https://www.washingtonpost.com/business/2023/11/21/fake-sale-deceptive-pricing/ (discussing how many retailers engage in fictitious pricing and why consumers "fall" for it); Patrick Coffee, Thought You Saved $60 on that Vacuum Cleaner? Think Again, Wall St. J. (Aug. 24, 2023), https://www.wsj.

12

com/articles/thought-you-saved-60-on-that-vacuum-cleaner-think-again-c89ce344 (highlighting that deceptive or fictitious pricing is "making a comeback" and that there is now increased litigation around deceptive pricing practices for large retail stores); Kristin Schwab, <u>Retailers are Stuck in a Cycle of Constant Sales</u>, <u>Marketplace</u> (Jan. 17, 2024), https://www.marketplace.org/2024/01/17/retailers-are-stuck-in-a-cycle-of-constant-sales/ (stressing that "retailers can hide behind deals to carry out shady business practices" and that with retailers constantly advertising sales, consumers will "truly never know if a deal is too good to be true").

Thus, retailers like Aéropostale are allegedly using fictitious pricing -- a known CFA violation -- as a deceptive scheme to influence consumer behavior and choices, with seemingly very few repercussions.

## IV.

### A.

Second, and central to this appeal, plaintiffs successfully alleged that they suffered "an ascertainable loss" because of defendant's deceptive pricing scheme. Plaintiffs alleged that they received neither the discounts nor the represented value of the items they were promised or expected. And importantly, plaintiffs did not make those allegations summarily. Plaintiffs alleged with specificity that:

13

92. . . . customers suffered an ascertainable loss and monetary damages because they did not enjoy the actual discounts A[é]ropostale represented and promised to them.

93. . . . customers suffered an ascertainable loss and monetary damages because the items they purchased were not in fact worth the inflated amount that A[é]ropostale represented to them. In fact, the items did not normally sell for, and were not actually worth, the fictitious and invented list price that Aéropostale printed on its price tags and on its website.

Plaintiffs also alleged that they "failed to receive the full benefit of the purported discounts offered by [d]efendant" and "did not receive the claimed value of [their] purchase, but rather received items worth far less than the value claimed by [d]efendant." (emphasis added). Moreover, plaintiffs alleged that they suffered an ascertainable loss because plaintiffs "would not have made any purchases from [d]efendant's A[é]ropostale stores at all but for the false promises by [d]efendant that [p]laintiffs were receiving merchandise at a significant discount." As made clear by plaintiffs on appeal, those claims, in essence, allege two theories of ascertainable loss: benefit-of-the-bargain theory and out-of-pocket loss theory.

Plaintiffs reinforced those allegations by referencing academic research and studies to support their contentions -- research the majority fails to mention. This body of research helps remove any suggestion that plaintiffs'

14

ascertainable loss is somehow not "quantifiable or measurable," or that it is somehow "hypothetical or illusory." Plaintiffs specifically alleged that:

> 32. Decades of academic research [have] established that the use of reference prices, such as those utilized by A[é]ropostale, materially impacts consumers' behavior. A reference price affects a consumer's perception of the value of the transaction, the consumer's willingness to make the purchase, and the amount of money the consumer is willing to pay for the product.

> 33. Indeed, sellers understand that a product's "regular" or "reference" price -- the price at which it is typically sold in the marketplace -- matters to consumers, as does a representation that a product is on "sale" or is discounted.

> 34. . . . consumers are much more likely to purchase an item if they are told that it is being offered at a "sale" or discounted price that is lower than the price at which the seller previously sold the product, and/or where consumers are told that an item is worth much more than what they are currently being asked to pay for it. As the old adage says, "everyone loves a bargain."

And in support of those allegations, plaintiffs cite to ten consumer behavior research articles in their complaint.

B.

Despite plaintiffs' specific and detailed allegations, the majority concludes, contrary to the Attorney General's formidable contentions in his merits brief and at oral argument before us, that plaintiffs failed to plead that they suffered an ascertainable loss. Ante at ___ (slip op. at 18). I respectfully

15

disagree. "An ascertainable loss is a loss that is 'quantifiable or measurable'; it is not 'hypothetical or illusory.'" Lee, 203 N.J. at 522 (quoting Thiedemann, 183 N.J. at 248). We have articulated that "[t]he CFA does not demand that a plaintiff necessarily point to an actually suffered loss or to an incurred loss, but only to one that is 'ascertainable.'" Bosland, 197 N.J. at 559. And "[i]n cases involving breach of contract or misrepresentation, either out-of-pocket loss or a demonstration of loss in value will suffice to meet the ascertainable loss hurdle and will set the stage for establishing the measure of damages." Thiedemann, 183 N.J. at 248.

C.

This Court has acknowledged that because a plain meaning cannot be ascribed to the term "ascertainable loss" and legislative history does not "shed[] direct light" on its meaning, "[w]e must look to the clear objectives of the [CFA] itself, informed by well-established remedies available in a typical breach-of-contract case, to find the meaning of ascertainable loss." Furst, 182 N.J. at 11. Thus, a court's analysis of ascertainable loss "is informed by basic principles of contract law" including, as we have recognized in Furst and as the majority identifies, the benefit-of-the-bargain theory. Id. at 13; see ante at ___ (slip op. at 16). That is where I begin.

16

Under a benefit-of-the-bargain theory, "the innocent party must be given the 'benefit of his bargain' and placed in 'as good a position as he would have been in had the contract been performed.'" Furst, 182 N.J. at 13 (quoting Scully v. US WATS, Inc., 238 F.3d 497, 512 (3d Cir. 2001)). In other words, "the innocent party has a right to damages 'based on his expectation interest as measured by . . . the loss in the value to him' caused by the breaching party's nonperformance." Ibid. (omission in original) (quoting Restatement (Second) of Contracts § 347(a) (Am. Law Inst. 1981)). Thus, the benefit-of-the-bargain theory is applicable, as the majority precisely identifies, "[w]hen a consumer claims that there is a difference in value between an item as advertised and the item as delivered, but the item is not worthless." Ante at ___ (slip op. at 16).

In Smajlaj v. Campbell Soup Co., 782 F. Supp. 2d 84, 99 (D.N.J. 2011), an opinion on which the majority relies, the United States District Court for the District of New Jersey applied the benefit-of-the-bargain theory to determine ascertainable loss under the New Jersey CFA. There, the late Judge Jerome B. Simandle insightfully explained that the benefit-of-the-bargain theory "requires nothing more than that the consumer was misled into buying a product that was ultimately worth less to the consumer than the product he was promised." Ibid. Thus, in agreement with the majority, to determine ascertainable loss utilizing a benefit-of-the-bargain theory, we compare "what

17

consumers actually received to what they would objectively expect to receive, based on their bargain." Ante at ___ (slip op. at 17).

The majority, however, asserts that plaintiffs do not sufficiently allege an ascertainable loss under the benefit-of-the-bargain theory because the items plaintiffs received were not alleged to be "defective," "damaged," or "worth less than they paid." Ante at ___ (slip op. at 23). Instead, as the majority contends, the plaintiffs received exactly what they were promised and purchased. Ante at ___ (slip op. at 23). But, in his well-reasoned opinion, Judge Simandle correctly pointed out that even though it "is often the case that the difference between the promised product and the product actually received is some defect or flaw in the product, there is no requirement that the product actually received be defective or deficient in any way other than that it is not what was promised." Campbell Soup Co., 782 F. Supp. 2d at 99; see also Union Ink Co., Inc. v. AT&T Corp., 352 N.J. Super. 617, 646 (App. Div. 2002) ("An ascertainable loss occurs when a consumer receives less than what was promised."). That is indeed what plaintiffs alleged here.

And in Thiedemann, we stated that as to the plaintiffs' benefit-of-the-bargain claims, the plaintiffs would need to provide evidence "to support or infer a quantifiable loss" because "subjective assertions without more are insufficient to satisfy the requirement of an ascertainable loss that is expressly

18

necessary for access to the CFA remedies." 183 N.J. at 252. Of course, a consumer's expectations of what was promised must be objective and reasonable. But as Judge Simandle aptly explained in Campbell Soup Co., if a "consumer received a product that 'was worth objectively less than what one could reasonably expect,' then that type of defeated expectation is an injury." 782 F. Supp. 2d at 99-100. Plaintiffs adequately alleged that their reasonable expectations were not met because they "did not enjoy the actual discounts Aéropostale represented and promised to them," and that, based on the reference price, "the items they purchased were not in fact worth the inflated amount that Aéropostale represented to them." On a Rule 4:6-2(e) motion, we must accept those allegations as true.

Our reasoning in Furst and consumer behavior research further supports my conclusion that, here, plaintiffs pleaded ascertainable loss utilizing a benefit-of-the-bargain theory. Plaintiffs alleged that they did not receive what they reasonably expected -- an expectation premised on what Aéropostale falsely promised, and further, the loss plaintiffs suffered as a result is objectively measurable and quantifiable.

To illustrate this, I first turn to our discussion in Furst which itself is centered on consumer behavior and perception, and how courts can reasonably quantify the "replacement value" of an item to assess the damages warranted

19

for a CFA claim.[4]  Furst, 182 N.J. at 14-18.  In concluding that the regular list price on an item's price tag may be evidence of replacement value, the Furst Court emphasized that "[m]erchants understand that one of the central tenets of market psychology is that consumers do not want to pay full retail price and are always in search of the best deal."  Id. at 17 (emphasis added).  Relying on consumer behavior studies, the Furst Court candidly discussed how placing a reference price and a sales price on a particular item "focuses consumers' attention on the difference between the two prices.  This leads to a perception of greater value concerning the purchase of the product."  Ibid. (quoting Bruce L. Alford & Abhijit Biswas, The Effects of Discount Level, Price Consciousness and Sale Proneness on Consumers' Price Perception and Behavioral Intention, 55 J. Bus. Res. 775, 775 (2002)).

---

[4]  The majority distinguishes Furst stating that, unlike this appeal concerning ascertainable loss, the Furst Court focused on the award of damages, and that "[t]here is no calculation of 'damages sustained' unless the ascertainable loss requirement is first satisfied."  D'Agostino v. Maldonado, 216 N.J. 168, 192 (2013).  But the majority respectfully failed to consider another aspect of D'Agostino -- that "'[a]scertainable loss' and 'damages sustained' are not . . . unrelated to one another."  Ibid. (emphases added).  The Court goes on to state that "[i]n a given case, the same quantifiable loss of money or other property, suffered by the plaintiff as a result of the defendant's CFA violation, may serve both purposes in the analysis, consistent with the statute's remedial intent and the requirement of proving damages with certainty."  Id. at 193 (emphasis added).

20

In addition, like my original hypothetical concerning a consumer being induced into purchasing a purportedly $1,000 coat offered for $300, "consumers are less likely to search other retail locations and have an increased likelihood of purchase" when fictitious pricing like that of Aéropostale's exists.  Ibid. (quoting Alford & Biswas, 55 J. Bus. Res. at 775). Recognizing that consumers have a "commonsense desire to buy at a reduced price," ibid., and that retailers are "expected to know the value of the merchandise they place for sale to the public," id. at 18, this Court held that

> [t]he strong remedial policy undergirding the [CFA] leads us to conclude that the regular price advertised on the sales sticker is a relevant benchmark from which to impute replacement value.  Accordingly, there will be a rebuttable presumption that the regular price on the sales sticker is the replacement value of the [item].
>
> [Id. at 18-19 (emphasis added) (citation omitted).]

To support the assertion of this rebuttable presumption, we noted in Furst how

> [w]e are mindful that misleading advertising is a deceptive commercial practice.  It is a deceptive practice under the [CFA] for a retailer to artificially inflate the price for an item of merchandise for the purpose of advertising the item at a large reduction. . . . [W]e believe that an unscrupulous merchant might pause before inflating a regular price on a sales sticker if that price was evidence of replacement value. Therefore, the rebuttable presumption that regular price equals replacement value may deter some merchants who might otherwise inflate the regular price to make the sale more appealing to the public.

21

[Id. at 20 (emphasis added) (citations omitted).]

And in interpreting the Division of Consumer Affairs' regulations defining a "former price in 'a price reduction advertisement,'" we stated unequivocally that "the regular price must bear some relationship to what the retailer considered to be the market value of the merchandise 'in the recent, regular course of his business.'" Id. at 16-17 (quoting B. Sanfield, Inc. v. Finlay Fine Jewelry Corp., 258 F.3d 578, 580 (7th Cir. 2001)).

In other words, we recognized in Furst that a reference price or former price may be equated with the value of an item. See 182 N.J. at 18-19. Thus, contrary to the majority's apparent conclusion that plaintiffs held subjective and unreasonable expectations about the items' value, and applying what this Court has said in Furst, it is objectively reasonable for a consumer to believe that a former price or reference price is illustrative of the value of an item. See also Hinojos v. Kohl's Corp., 718 F.3d 1098, 1105-06 (9th Cir. 2013) (discussing that to some consumers "a product's 'regular' or 'original' price matters; it provides important information about the product's worth and the prestige that ownership of that product conveys"). Notably, this behavior where a consumer equates a reference price with value is exactly "why retailers . . . have an incentive to advertise false 'sales.'" Id. at 1106.

22

If a plaintiff pleads that the retailer's reference price represented to the consumer was false or inflated, then the consumer has been deceived and has shown ascertainable loss by the consumer's objective reasonable belief that they received an item of less value than what the retailer represented and promised. Furst illustrates how this Court has prioritized deterring the deceptive practice of fictitious pricing, see 182 N.J. at 20, and I would uphold those long-standing principles by reinstating plaintiffs' complaint.

Lastly, recent consumer behavior research analyzing fictitious pricing and its impact on consumers provides additional support that plaintiffs sufficiently pleaded an objective, reasonable, and measurable ascertainable loss. Despite being acknowledged in plaintiffs' complaint, the majority fails to consider the body of research showing (1) how consumers equate a product's former price with its value and quality, and (2) that consumers place value on the bargain itself.[5]

In his article centered on fictitious pricing, Professor David Adam Friedman discusses how "[a] higher fictitious 'former price' disingenuously

---

[5] Plaintiffs cite ten articles in their complaint to support their allegations. I build upon the research plaintiffs provide to include more published articles in this dissent to illustrate how this body of academic research continues to grow nationally, adding further support to plaintiffs' allegations that consumer behavior is greatly impacted by this deceptive practice.

causes the consumer to attach a higher level of value to an item than it would have had the pricing been honest," and describes how "[c]onsumers may also use a former reference price as a signal of quality."  David Adam Friedman, Reconsidering Fictitious Pricing, 100 Minn. L. Rev. 921, 934-35 (2016).  More specifically, Professor Friedman explains that

> [i]f the price signal is genuine -- i.e., the good was once offered in a bona fide manner at a higher price, the advertised discount communicates the availability of a true bargain. . . .  If the signal proves false, however, the consumer transacts on a false association of quality.
>
> [Id. at 935 (emphasis added).]

Mark Armstrong and Yongmin Chen further discuss in their article on discount pricing two reasons why a consumer is more willing to purchase an item with a discounted price as compared to a low initial price:  (1) "a high initial price can indicate the seller has chosen to supply a high-quality product" and (2) "when a seller with limited stock runs a clearance sale, later consumers infer that unsold stock has higher expected quality when its initial price was higher."  Mark Armstrong & Yongmin Chen, Discount Pricing, 58 Econ. Inquiry 1614, 1614 (2020).

Moreover, researchers Richard Staelin, Joel E. Urbany, and Donald Ngwe recently published a study on fictitious pricing and explained how there is "robust and empirically documented observation[s] that when most

24

consumers buy a product, they consider not only the actual transaction price . . . but also the expected savings relative to some normal (reference) price." Staelin, Urbany, & Ngwe, 87 J. of Mktg. at 830.  The researchers explain that an "attractive deal" has the ability "to disrupt search and encourage a consumer to stop [searching for goods] even earlier, since the deal increases the perceived utility of the offering and, thus, the offering is more likely to meet or exceed the expected value of the consumer's outside option."  Id. at 831 (citations omitted); see also Gorkan Ahmetoglu, Adrian Furnham, & Patrick Fagan, Pricing Practices:  A Critical Review of their Effects on Consumer Perceptions and Behaviour, 21 J. of Retailing & Consumer Servs. 696, 699 (2014) (discussing how numerous studies taken together illustrate that "the presence of a reference price increases consumers' deal valuations and purchase intentions and can lower their search intentions as compared to the case where a reference price is absent").

D.

Taking into consideration (1) the CFA's strong remedial purpose to protect consumers, (2) the Legislature's intent to cement the CFA as "one of the strongest consumer protection laws in the nation" by creating a private right of action to assist in reducing the Attorney General's enforcement burdens, Bosland, 197 N.J. at 555 (emphasis added), (3) our case precedents,

25

(4) consumer behavior research, and (5) the invaluable <u>practical</u> insight provided by the Attorney General appearing as amicus, it is clear to me that plaintiffs here have sufficiently pleaded that they suffered an ascertainable loss under a benefit-of-the-bargain theory after being deceived by Aéropostale's fictitious pricing scheme.

Contrary to the majority's view, plaintiffs' ascertainable loss is objective and reasonable. As alleged in the complaint, plaintiffs reasonably believed -- when viewing the discounts advertised and promised by Aéropostale -- that the products were worth a higher value but were being sold at a discounted price, yielding a certain amount of savings. Based on our reasoning in <u>Furst</u> and consumer behavior research, it is apparent that these beliefs are common and reasonable among consumers. In fact, that is exactly why retailers engage in the deceptive practice of fictitious pricing. <u>See</u> <u>Hinojos</u>, 718 F.3d at 1106; <u>Furst</u>, 182 N.J. at 17 ("Merchants draw consumers into their stores by holding sales events . . . that promise the regular value of a product at a reduced price.").

Although plaintiffs do not allege that they received "defective" products (i.e., non-wearable clothing), as was the case in <u>Furst</u>, a "defective" or "flawed" product is not always required to show ascertainable loss under the benefit-of-the-bargain theory. <u>See</u> <u>Campbell Soup Co.</u>, 782 F. Supp. 2d at 99

26

("[T]here is no requirement that the product actually received be defective or deficient in any way other than that it is not what was promised."). It is enough at the motion-to-dismiss stage that plaintiffs alleged they "received items worth far less than the value claimed by [d]efendant." (emphasis added). Moreover, what Aéropostale promised based on the information it provided (i.e., reference prices), were products worth a higher value and a realization in savings. Plaintiffs received neither and, therefore, contrary to the majority's conclusion, plaintiffs did not receive "exactly what they knowingly purchased." Ante at ___ (slip op. at 23).

And importantly, plaintiffs' ascertainable loss is measurable and quantifiable as the difference between the reference price on the products and the amount they actually purchased the products for -- i.e., reference price minus (-) purchase price equals (=) ascertainable loss. Applying that formula to the facts alleged in the complaint concerning the "hoodie" Robey purchased, Robey's ascertainable loss can be quantified by looking at the difference between $59.95 (the reference price) and what she paid for the "hoodie," $23.98 (the purchase price), which equals $35.97. That equation, one that the Attorney General urges this Court to utilize, would be similarly applied to the additional factual allegations made by plaintiffs.

27

Although the majority identifies that other jurisdictions have declined to hold that consumers are injured by rampant fictitious pricing schemes, we must not forget the legislative history and intent surrounding the enactment of the CFA's private cause of action: "to 'give New Jersey <u>one of the strongest consumer protection laws in the nation</u>.'" <u>Bosland</u>, 197 N.J. at 555 (emphasis added).

V.

Although the issue of whether plaintiffs have pleaded out-of-pocket loss need not be reached given my conclusions that plaintiffs have sufficiently pleaded ascertainable loss under the benefit-of-the-bargain theory, I cannot ignore Judge Maritza Berdote Byrne's thoughtful concurring opinion that plaintiffs sufficiently pleaded an ascertainable loss under the out-of-pocket loss theory. <u>See</u> <u>Robey v. SPARC Grp. LLC</u>, 474 N.J. Super. 593, 606 (App. Div. 2023) (Berdote Byrne, J.S.C. (temporarily assigned), concurring). Therefore, I will briefly discuss the applicability of out-of-pocket loss theory to the present case.

"[O]ut-of-pocket loss . . . will suffice to meet the ascertainable loss hurdle . . . ." <u>Thiedemann</u>, 183 N.J. at 248. A plaintiff can suffer an out-of-pocket loss that is ascertainable and that is equated to the purchase price of the product when the plaintiff purchases a completely worthless item. <u>See</u> <u>Lee</u>,

28

203 N.J. at 527-28 (concluding that when representations about a product are "baseless" then the out-of-pocket loss is the purchase "of the worthless product"). A plaintiff may also illustrate an out-of-pocket loss if they spent money to repair a defective product. See Thiedemann, 183 N.J. at 251-52.

The majority correctly asserts that the present case is distinguishable from past decisions, ante at ___ (slip op. at 20-21), but it does not adequately consider Dugan v. TGI Fridays, Inc., 231 N.J. 24 (2017). In Dugan, where the plaintiffs brought a class action CFA claim against a restaurant that did not list the price of beverages on its menus, we noted that "[i]ndividual plaintiffs may be able to establish ascertainable loss and causation by showing that they would not have purchased the beverages or would have spent less money on them had they been informed of their cost." Id. at 60. Here, plaintiffs allege -- and we must accept the allegations as true at this stage -- that "they would not have purchased the [clothing] items at the prices they paid had they known the items had not been regularly offered or sold at the higher list price," or had they been informed that the discounts were false. Therefore, plaintiffs here suffered an out-of-pocket loss that is ascertainable, i.e., the purchase price of the clothing items.

Other jurisdictions have adopted this approach or similar approaches to out-of-pocket loss. In Munning v. Gap, Inc., a case with substantially similar

29

facts to the present appeal, the United States District Court for the Northern District of California interpreted the New Jersey CFA and held that the plaintiffs sufficiently pleaded an out-of-pocket loss because the plaintiffs alleged that they would not have purchased the products if the plaintiffs knew that the discounts were false, even though the items the plaintiffs purchased were not worthless.  238 F. Supp. 3d 1195, 1201 (N.D. Cal. 2017).

Moreover, in Hinojos, the United States Court of Appeals for the Ninth Circuit, interpreting California law, held "that when a consumer purchases merchandise on the basis of false price information, and when the consumer alleges that he would not have made the purchase but for the misrepresentation, he has standing to sue . . . because he has suffered an economic injury."  718 F.3d at 1107.  Although standing to sue under California law is slightly different than the ascertainable loss requirement under the CFA, the general principles regarding harm and loss to the consumer apply.

And most recently in Clark v. Eddie Bauer LLC, another case with similar facts to the present case, the Oregon Supreme Court held that, under Oregon law, "when a person acts in response to [a store's] deception by spending money that the person would not otherwise have spent, the person has been injured to the extent of the purchase price as a result of that

30

deception." 532 P.3d 880, 893 (Or. 2023) (emphasis added). In other words, if a "plaintiff paid money . . . for articles of clothing that she would not have bought <u>had she known their true price history</u>," then "[t]he money that [the] plaintiff is out as a result is her 'loss.'" <u>Id.</u> at 891 (emphasis added).

Thus, here, because plaintiffs alleged that they would not have purchased the items had they known the discounts were false, they arguably sufficiently pleaded an out-of-pocket loss that would equate to the purchase price of the items.

The fact that plaintiffs did not allege that they attempted to return the items is of no moment, especially at this stage in the litigation. Our decision in <u>Bosland</u> is instructive of this point. We held in <u>Bosland</u> that "the CFA does not require a consumer, who has been victimized by a practice which the statute is designed to remedy, to seek a refund from the offending merchant as a prerequisite to filing a complaint." 197 N.J. at 547-48. Importantly, we emphasized that interpreting the CFA to require a pre-suit demand "would potentially permit practices, that the statute is designed to deter, . . . to continue unabated and unpunished." <u>Id.</u> at 561. We maintained that "[s]uch an analysis of the CFA would limit relief by making it available only to those consumers who are alert enough to ask for a refund, while allowing the offending merchant to reap a windfall." <u>Ibid.</u>

31

Thus, our precedent does not support the notion that for plaintiffs here to successfully plead ascertainable loss under an out-of-pocket loss theory, they must have attempted to return the items. Just because plaintiffs could have returned the items and "theoretically, could have secured complete relief in no way diminishes the fact that" plaintiffs "sustained an immediate quantifiable loss" when they were tricked into purchasing items they otherwise would not have paid for due to defendant's misrepresentations. Id. at 559.

## VI.

Echoing our sentiments from twenty years ago in Furst, the CFA "cannot be construed to allow an offending merchant to benefit from his own deception." 182 N.J. at 14. I would have let this case proceed in the ordinary course: discovery, motion practice if warranted, then trial. I therefore dissent.